220 N.J. Super. 532 (1987)
533 A.2d 41
STATE OF NEW JERSEY, PLAINTIFF-RESPONDENT,
v.
HENRY MICHELICHE, JR., DEFENDANT-APPELLANT.
Superior Court of New Jersey, Appellate Division.
Argued March 31, 1987.
Decided June 8, 1987.
*534 Before Judges ANTELL, LONG and D'ANNUNZIO.
Eric J. Marcy argued the cause for appellant (Wilentz, Goldman & Spitzer, attorneys; Warren W. Wilentz of counsel and Eric J. Marcy of counsel and on the brief).
Robin Parker, Deputy Attorney General, argued the cause for respondent (W. Cary Edwards, Attorney General, attorney; Robin Parker of counsel and on the brief).
The opinion of the court was delivered by ANTELL, P.J.A.D.
Around noon, March 27, 1984, the badly beaten, naked body of Neal McClain was found in a secluded wooded area of Berkeley Township. Police investigation led to defendant who voluntarily came to the prosecutor's office that night. At 11:58 p.m. he signed a form entitled "Consent to Question" which read as follows:
I hereby acknowledge that I have voluntarily agreed to answer questions by representatives of the Ocean County Prosecutor's Office. I have been advised that these questions will pertain to Neal McClain. I am appearing for this *535 questioning voluntarily, and I am aware that I am free to terminate the questioning and leave at anytime I so choose.
According to the detectives, the form is used primarily for preliminary interviews before it is known whether the party questioned is a witness, suspect or target of an investigation. When they began questioning defendant all that the officers knew about him was that he had been with decedent on the night of March 24 to 25, 1984, the probable date of death.
When defendant was shown a picture of McClain he first said he was unable to identify it. He stated that he had been at the Villager Inn that night with some friends and afterward visited the Riverside Pub. However, he later admitted that he had met the man pictured in the photo that night at the Pub. He also acknowledged that he took a ride with McClain, Nicholas Correa, and an unidentified man somewhere in Toms River where an altercation occurred between McClain and the other two. He also said that he witnessed Correa and the unidentified man beat up McClain.
At no time during the questioning, until defendant made his first incriminating statement, was defendant advised of his constitutional rights as required by Miranda v. Arizona, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966), but the investigators claimed that he was free to leave and was not under arrest. They testified that defendant never asked to leave, to use the bathroom or the telephone or to be brought water. Defendant was described as being very quiet, nervous and cooperative. The questioning continued, however, because the investigators felt he was not being truthful.
At approximately 3:00 a.m. defendant was told that Correa, who was being questioned in another room, had just confessed and had implicated defendant. At that point, defendant blurted out "I did it," and agreed to reveal his involvement in the homicide. The interview then terminated, defendant was placed under arrest and advised of his Miranda rights, which he thereupon waived in writing. The questioning resumed and defendant gave a statement in which he described how he and *536 Correa had beaten McClain to death in the early hours of March 25, 1984. The statement, which had been taped, was reduced to six written pages. Defendant signed the statement and initialed each page. At the trial, defendant's initial admission, "I did it," and the written statement which followed the giving of the Miranda warnings were received in evidence.
Defendant contends that his initial verbal admission was given while he was in a custodial situation and in response to police interrogation. Because he had not first received his Miranda warnings he argues that it should not have been received in evidence, and because the later written statement was thereby "tainted," that, too, should have been excluded from the trial.
In analyzing defendant's contention our first inquiry must be whether or not he was in custody at the time he made his initial admission of guilt. The fourfold warnings enunciated in Miranda v. Arizona, supra, are required only when the subject is in custody or otherwise deprived of his freedom of action in any significant way. Id. at 477, 86 S.Ct. at 1629; State v. Graves, 60 N.J. 441, 448-449 (1972). That questioning takes place in a coercive environment is not enough to trigger the Miranda requirements since any interview of a suspect by a police officer will have its coercive aspects. Oregon v. Mathiason, 429 U.S. 492, 495, 97 S.Ct. 711, 714, 50 L.Ed.2d 714, 719 (1977). Nor are warnings required simply because questioning takes place in a police building or because the person being questioned is a suspect in the case. Ibid; State v. Downey, 206 N.J. Super. 382, 396 (App.Div. 1986). The test is whether the admission was a product of "custodial interrogation." State v. Graves, supra, 60 N.J. at 448; State v. Marks, 201 N.J. Super. 514, 527-528 (App.Div. 1985).
The trial court found that the interrogation was not custodial. Its conclusion was based on defendant's voluntary presence at the prosecutor's office and his written acknowledgement that he knew he was free to leave. Defendant replies that he was *537 picked up from his home and transported to the prosecutor's office by an investigator, that the prosecutor's office already had information that he was with McClain on the night of the killing and that he had seen him beaten by Correa and the other man. Further, the interrogation continued without interruption for three hours until defendant was confronted with a confession by his accomplice inculpating the two men. The State's rebuttal is that defendant remained free to leave even after Correa's confession because, it states, it still did not have enough evidence to arrest him.
Although the factual findings of a trial judge will not be disturbed if they are based on sufficient credible evidence in the record, we will not hesitate to make new findings where they are not exclusively factual but are intertwined with legal conclusions drawn from Miranda and its progeny. State v. Godfrey, 131 N.J. Super. 168, 174-175 (App.Div. 1974), aff'd o.b. 67 N.J. 267 (1975). Thus, a statement by a police detective to the effect that a suspect was free to leave may be incredible and not worthy of belief as a matter of law. State v. Godfrey, supra, 131 N.J. Super. at 177. In Godfrey, defendant had come voluntarily to the police station and was administered a polygraph test. He was told that he had lied and he then confessed. Id. at 172-173. Pointing out that custody does not necessarily involve a formal arrest or physical restraint, we concluded that it could not be seriously argued that the police would allow defendant to leave the police station after they had information that he had lied to them and had actually done the shooting. Id. at 175, 177.
In our view the same analysis is controlling here. While the State is entitled to the benefit of all favorable inferences which may be drawn from the testimony of its investigating officers, we find it impossible to credit their statement that after Correa had implicated both men in the killing the defendant was free to leave the prosecutor's office. At that point the police knew defendant had lied, that by his own admission he *538 was present when McClain was killed, and, according to Correa, had actually taken part in administering the beating. Under these circumstances the conclusion is unavoidable that defendant's initial admission, "I did it," was the product of custodial interrogation and should have been suppressed.
Whether defendant's later written statement, given after the Miranda warnings, was nevertheless "tainted" by the first is a question which is controlled by the decisions of the United States Supreme Court in Oregon v. Elstad, 470 U.S. 298, 105 S.Ct. 1285, 84 L.Ed.2d 222 (1985), and the New Jersey Supreme Court in State v. Hartley, 103 N.J. 252 (1986). In Oregon v. Elstad, when arresting officers told defendant they believed he was involved in a burglary, defendant answered "Yes, I was there." He was then transported to the Sheriff's headquarters where, one hour later, Miranda warnings were given for the first time and defendant gave a complete confession. The question presented to the United States Supreme Court was whether the post-Miranda confession had been tainted by the prior unwarned admission either because it was the "fruit of the poisonous tree" or because a confession cannot be considered voluntary once the "cat is out of the bag." Oregon v. Elstad, supra, 470 U.S. at 303, 105 S.Ct. at 1290, 84 L.Ed.2d at 228.
Observing that the prophylactic Miranda warnings are not themselves rights protected by the Constitution but are a means of insuring that the right against compulsory self-incrimination will be protected, the Court concluded that a Miranda violation alone does not constitute coercion; rather, it affords a bright-line standard requiring suppression of all statements not preceded by a warning. Id. 470 U.S. at 306, n. 1, 105 S.Ct. at 1292, n. 1, 84 L.Ed.2d at 230-231, n. 1. But it does not require that all fruits of such statements be discarded as inherently tainted. It was therefore the majority's view that it would be an unwarranted extension of Miranda to hold that a simple failure to warn, unaccompanied by actual coercion or other *539 circumstances inimical to defendant's free will, so contaminates the police process that a subsequent voluntary and informed waiver is ineffective. Id. 470 U.S. at 309, 105 S.Ct. at 1293, 84 L.Ed.2d at 232.
The majority was also unwilling to find that the defendant's confession had resulted from the psychological compulsion that flows from his belief that he had "let the cat out of the bag" and had "sealed his own fate." Id. 470 U.S. at 311, 105 S.Ct. at 1294, 84 L.Ed.2d at 233. In rejecting this finding, the Court refused to equate the psychological impact that voluntary disclosure of a guilty secret would have with official compulsion so as to compromise the voluntariness of the statement. Id. 470 U.S. at 312, 105 S.Ct. at 1295, 84 L.Ed.2d at 234. Any connection between the potential psychological disadvantage created by a defendant's admission and a defendant's ultimate decision to cooperate was found to be "speculative and attenuated at best." Id. 470 U.S. at 313, 105 S.Ct. at 1296, 84 L.Ed.2d at 235.
The Supreme Court of New Jersey has also spoken on this subject, albeit in dicta. In State v. Hartley, supra, the issue was the admissibility of two inculpatory statements given by a defendant during custodial interrogations by separate branches of law enforcement who were pursuing a joint investigation. The defendant initially asserted his right to remain silent, but then gave a statement to federal authorities without benefit of new Miranda warnings. He later gave another statement to state authorities after a fresh warning had been given. State v. Hartley, supra, 103 N.J. at 255.
The Supreme Court concluded that the first statement was inadmissible because defendant's previously asserted right to remain silent had not been honored. Id. at 277-278. In concluding that the second statement was also inadmissible the Court noted the crucial difference between the case before it and that considered in Oregon v. Elstad, supra. Because the failure to furnish defendant in Elstad with his Miranda warnings *540 was not a constitutional violation, the second statement could not be perceived as the fruit of a constitutional violation and was therefore admissible. State v. Hartley, supra, 103 N.J. at 282-283. In Hartley, however, the failure to respect the previously invoked right to remain silent was a violation of constitutional magnitude, thus invoking the "taint" doctrine. Id. at 283. In a concurring opinion, Justice Handler noted the basic rationale which he felt should be drawn from Elstad, that a violation of only the prophylactic rules incidental or ancillary to constitutional rights is not itself a constitutional violation. Id. at 291-292.
We conclude that the defendant's written statement was properly received in evidence.
Although not denying that his confession was voluntarily given and signed, defendant rested on his testimony that the confession was untrue and that he had given it because he feared that Correa would kill him in jail if he denied his own involvement. Defendant attempted to demonstrate that his fears were well grounded by testifying to threats made by Correa and his experiences on other occasions when Correa had given vent to nearly homicidal fury.
On cross-examination defendant conceded he was no longer afraid of Correa because, as he said, "I know that Nick can't get me." After ascertaining that defendant had come to this realization some time before, the prosecutor asked defendant whether he had ever gone to the prosecutor's office to change his story. The question was allowed over objection, the court reasoning that this was the first time defendant had given the State "an entirely different version." The prosecutor pressed further by asking whether, during the fourteen months of his pretrial incarceration when he realized he was safe and he was represented by an attorney, either he or his attorney ever informed the prosecutor's office as to the true reason for the confession. Defendant answered, "I am supposed to work with my attorney," whereupon the prosecutor then asked whether *541 his attorney had ever gone to the prosecutor. Defense counsel again objected and offered to testify as to why he chose not to go to the prosecutor's office. The trial court then instructed the prosecutor to "get out of this area." Defendant contends that the cross-examination directly impugned his right to remain silent. We agree.
In State v. Deatore, 70 N.J. 100 (1976) the prosecutor cross-examined defendant in a robbery prosecution as to why he had failed to give his exculpatory information to the police at or about the time of his arrest. The Supreme Court rejected the State's argument that the question properly affected defendant's credibility. The State contended that an innocent man would have asserted the information to someone in authority at the earliest opportunity in order to avoid arrest and trial. The Supreme Court concluded, however, that a defendant's failure to volunteer exculpatory information may not be shown on cross-examination notwithstanding that it might suggest that his trial testimony is untrue. The conclusion is based upon the privilege against self-incrimination. Id. at 113, n. 8. Thus, the result reached was that "a defendant is under no obligation to volunteer to the authorities at the first opportunity the exculpatory story he later tells at his trial and cannot be penalized directly or indirectly if he does not." Id. at 115.
In concluding that the prosecutor's cross-examination constituted reversible error we do not overlook the caveat in Deatore that its holding was not to apply to a situation "where a defendant did make a statement at or near arrest, which is inconsistent with his trial testimony, or where conduct (as distinct from silence) at the time of the crime or thereafter is inconsistent with the story told at trial." Id. at 108. State v. Marks, 201 N.J. Super. 514 (App.Div. 1985) exemplifies the kind of case contemplated by the foregoing language. There, when charged with robbery, defendant made an exculpatory exclamation which was inconsistent with the details of his defense which he relied upon at trial. Though both statements tended to establish his innocence, each was inconsistent with the other, *542 and it was held that the prosecutor was properly allowed to cross-examine defendant about the inconsistency. Here, defendant's written confession, far from being exculpatory, forms the basis of the prosecution. To highlight his failure to advise the State in advance of trial as to how he proposed to meet that evidence infringes upon his right to remain silent in the same manner as in State v. Deatore. Therefore, we are constrained to reverse the judgment of conviction and remand the matter for a new trial.
Defendant also complains about the court's failure to instruct the jury as to the legal effect of his voluntary intoxication and as to the lesser included offenses of aggravated manslaughter and reckless manslaughter. Neither issue was raised in the Law Division and we call counsel's attention to the fact that this was not indicated in his table of contents, in violation of R. 2:6-2(a)(1).
In State v. Choice, 98 N.J. 295 (1985) the Supreme Court clarified a trial court's obligation to instruct a jury with respect to the elements of manslaughter where no request therefor has been made. There, the Appellate Division had reversed a conviction for failure of the trial court to charge, sua sponte, the elements of manslaughter. In reversing the Appellate Division and reinstating the murder conviction the Chief Justice wrote the following:
The trial court does not, by virtue of Powell [State v. Powell, 84 N.J. 305 (1980)], have the obligation on its own meticulously to sift through the entire record in every murder trial to see if some combination of facts and inferences might rationally sustain a manslaughter charge. It is only when the facts "clearly indicate" the appropriateness of that charge that the duty of the trial court arises. [State v. Choice, supra, 98 N.J. at 299].
N.J.S.A. 2C:1-8e provides that the court shall not charge the jury with respect to a lesser included offense "unless there is a rational basis for a verdict convicting the defendant of the included offense." See State v. Crisantos (Arriagas), 102 N.J. 265, 276-278 (1986); State v. Sinclair, 49 N.J. 525, 540 (1967). Defendant argues that his intoxication, his prior reputation as a *543 peaceful and law-abiding citizen, and the total absence of any evidence of his ill-will toward the victim or any other motive to murder him provide a rational basis for finding him guilty of a lesser included offense.
As to defendant's intoxication, although the evidence indicates that defendant had been drinking heavily from 5:00 that afternoon through the night, the evidence would not have supported a finding that he was intoxicated to the point that he could not perform the mental operation necessary for the crime of murder. While a defendant's voluntary intoxication might serve to demonstrate that he was incapable of performing a "knowing" or "purposeful" act, N.J.S.A. 2C:2-8a, State v. Cameron, 104 N.J. 42, 52 (1986), the degree of intoxication must be such as to bring about so great a prostration of the faculties that the requisite mental state was totally lacking. Id. at 54. The mere fact that defendant has consumed large quantities of alcohol does not suffice. Ibid.
Here defendant himself did not testify that he was intoxicated, and no expert testified to the probable effect of the liquor he had consumed. Witnesses who observed him a short time before the crime testified that he did not appear to be intoxicated and defendant's testimony showed a clear and detailed recollection as to the events of that evening. See State v. Selby, 183 N.J. Super. 273, 284 (App.Div. 1981).
Nor can we agree that there was any other rational basis in the evidence to justify a charge on manslaughter. Decedent, who was practically stuporous from drink with a blood alcohol level of.327%, sustained a beating of appalling severity. The medical examiner found a broken Adams apple, compression of the mucus lining underneath the air pipe from the nose to the lung, pressure marks on the neck, a lacerated left lung, liver and spleen caused by blunt instruments, an abdomen filled with blood, fractures of all twelve ribs on the left side, a broken bone behind the left eye, a fractured nose, cheek bone and jaw, a depression of the left chest, numerous cuts and abrasions *544 under the skin of the chest and face, a brain hemorrhage and an amputated penis and scrotal skin. Cause of death was asphyxiation resulting from laceration of the lung, liver and spleen.
Defendant admitted in his written statement that he was wearing boots that night and participated in the assault by kicking decedent's head and stomach. He also admitted that it was he who cut off the decedent's penis with a knife while it was being held by Correa with a pair of pliers.
The defense consisted of a total denial of any participation in the attack upon McClain. Defendant testified that the beating was carried out by Correa and an unidentified man and that he himself took no part. If the jurors believed this they could not find him guilty of any degree of homicide. On the other hand, the State's evidence indicated that defendant and Correa were acting in concert with one another, and the acts of each would therefore have been the acts of the other. N.J.S.A. 2C:2-6a; State v. Madden, 61 N.J. 377, 383 (1972). If the jury found that defendant had taken part in the fatal beating the evidence permitted a finding of guilt to nothing less than a purposeful and knowing murder.
The evidence submitted was not sufficient to require the judge on his own initiative to instruct the jury as to the effect of voluntary intoxication or as to manslaughter. Since these issues have been pursued on appeal, we assume that counsel's failure to raise them before the trial court was the result of inadvertence. Now that they are out in the open it is expected that on the retrial counsel will address them and clearly enlighten the court as to whether and how the jury should be instructed with respect thereto.
Defendant complains that the color photographs of the victim's body were unfair and inflammatory. The admissibility of photographs of a crime victim rests within the discretion of the trial judge and his ruling will not be overturned in the absence of a palpable abuse of that discretion. State v. *545 Thompson, 59 N.J. 396, 420 (1971); State v. Smith, 32 N.J. 501, 525 (1960), cert. den. 364 U.S. 936, 81 S.Ct. 383, 5 L.Ed.2d 367 (1961). Photographs will be deemed inadmissible only when their probative value is so significantly outweighed by their inflammatory potential to divert the minds of the jurors from a reasonable and fair evaluation of the basic issue of guilt or innocence. State v. Thompson, supra, 59 N.J. at 421. Although all pictures of a murdered body are likely to be unpleasant and cause emotional stirring, that of itself does not render them inadmissible. Ibid. Nor does the fact that this evidence was cumulative render it inadmissible. State v. Belton, 60 N.J. 103, 109 (1972). While the pictures, which have been included in the appendix, are ghastly, we observe that they were received into evidence after a careful selection process during which the judge excluded others which were also proffered by the State.
The State had assumed the burden of showing a purposeful and knowing murder, and the fact that the photographs were gruesome in their revelations does not detract from the fact that they were legitimately a part of the State's proof of defendant's criminal state of mind. From them the jury could infer that the attack was performed with such convulsive ferocity that it could only have been the product of a knowing purpose to cause death. We therefore find no merit to this contention.
Defendant's further contention that the process of death qualifying the potential jurors denied him a fair trial does not prevail. See, e.g., State v. Cohen, 211 N.J. Super. 544 (App.Div. 1986). See also Lockhart v. McCree, 476 U.S. 162, 106 S.Ct. 1758, 90 L.Ed.2d 137 (1986).
Defendant also complains that the trial court erred in failing to charge the jury to determine whether his confession was voluntary, that the indictment should have been dismissed because of the State's failure to correctly charge the grand jury, and that the verdict was against the weight of the *546 evidence. We find these contentions to be clearly without merit. R. 2:11-3(e)(2).
The judgment of conviction is vacated and the matter is remanded for a new trial.