858 A.2d 19 (2004)
372 N.J.Super. 252
STATE of New Jersey, Plaintiff-Respondent,
v.
Abdul A. ABDULLAH, Defendant-Appellant.
Superior Court of New Jersey, Appellate Division.
Submitted September 13, 2004.
Decided October 12, 2004.
*23 Yvonne Smith Segars, Public Defender, attorney for appellant (Frank J. Pugliese, Assistant Deputy Public Defender, of counsel and on the brief).
Jeffrey S. Blitz, Atlantic County Prosecutor, attorney for respondent (Jack R. Martin, Assistant Prosecutor, of counsel and on the brief).
Appellant filed a pro se supplemental brief.
Before Judges PETRELLA, LINTNER and YANNOTTI.
The opinion of the court was delivered by
LINTNER, J.A.D.
Following a jury trial, defendant Abdul A. Abdullah was convicted of knowing and purposeful murder, N.J.S.A. 2C:11-3a(1)(2) (Count One); second-degree burglary, N.J.S.A. 2C:18-2 (Counts Two and Three); third-degree possession of a weapon for an unlawful purpose, N.J.S.A. *24 2C:39-4d (Counts Four and Five); and fourth-degree unlawful possession of a weapon, N.J.S.A. 2C: 39-5d (Counts Six and Seven).
Prior to trial, defendant's motions to suppress evidence seized from the victim's apartment, dismiss the indictment, suppress the telephone toll records from the Atlantic County Jail to the victim's residence, and suppress his statements to the police were denied.
On September 13, 2002, the trial judge sentenced defendant on the murder conviction to a life term with a minimum period of thirty years without parole. On the third count armed burglary conviction, defendant was sentenced to a consecutive term of ten years with a five-year period of parole ineligibility. The remaining convictions were appropriately merged. Defendant appeals and we affirm.
Defendant, also known as Aleem, first met Catrina Lark in 1996 and thereafter they developed a relationship. Defendant would visit Lark during the day and return to his girlfriend Joan Robinson's apartment at night. Defendant fathered two children with Robinson and referred to her as his "wife." Defendant's relationship with Lark ended sometime between December 1998 and January 1999. Lark then began dating defendant's cousin Robert Boswell. After being incarcerated on January 15, 1999, in the Atlantic County Jail for a parole violation, defendant learned that Lark was seeing his cousin. Soon thereafter, Boswell was incarcerated in the same jail. On March 21, 1999, Corrections Officer Frank Timik observed an argument between defendant and Boswell while they were being visited by their respective girlfriends. Timik heard defendant call Lark a "bitch" and a "whore." Defendant and Boswell were thereafter placed on the no contact list.
According to Lark's mother, Shelby, Lark refused to accept daily collect calls from defendant after their relationship ended. Phone records from Atlantic County Jail indicate that defendant made 467 calls to Lark from the County Jail. (Defendant admitted making numerous calls to Lark, including 192 calls in a single day.) Shelby testified that one day in March, while she was visiting Lark, she accepted a call from defendant and used the occasion to tell him to stop calling her daughter because Lark did not want to be bothered by him anymore. Shelby stated that defendant responded: "If I can't have the bitch, nobody can have her. I'll kill her first."
Defendant claimed that he made the calls after he learned Lark was pregnant with his child and she threatened to abort the pregnancy if he did not leave his wife. Defendant told Lark that he would not leave his wife but that he would be a father to his child. He denied ever threatening Lark. Defendant was released from the county jail in April 1999.
On May 1, 1999, at approximately 3:30 a.m., Lark phoned Jessica Ruiz, her friend and neighbor who lived in an apartment across the street from her. At the time Ruiz was awake watching television with her then boyfriend, Lark's cousin, Ronald Taylor. Ruiz related that Lark called her and told her that defendant was outside "knocking on her window trying to get in her house." Before hanging up the telephone, however, Lark told Ruiz that defendant had left the area and that she would be all right.
Stella Hargrove lived on the second floor in the same apartment building as Lark. She testified that she was awakened in the early morning hours by a female voice in Lark's apartment saying, "Aleem don't hit me." Ronald Taylor woke up and left Ruiz's apartment between *25 7:00 and 8:00 a.m. He went across the street to visit Lark. When Taylor arrived at Lark's apartment, he found the door unlocked and Lark lying on the kitchen floor. The apartment was in complete disarray and Lark was lying in a pool of blood. Taylor ran back to Ruiz's house and told her to call the police.
Officer Ed Leon of the Atlantic County Police Department was dispatched to Lark's apartment. Leon found Lark lying on her kitchen floor, nude from the waist down, with a pool of blood around her head. She had no pulse, her skin was cold, and she was becoming rigid.
Police officers seized various items from Lark's apartment believed to be associated with the attack that were either near the body or in Lark's bedroom. The items included: a blood stained rolling pin, a broken clothes iron, a broken ceramic lamp, a broken cast iron frying pan, three blood-stained serrated steak knives with bent blades, three blood-stained kitchen knives with broken blades, and three intact bloodstained kitchen knives. Only two items, both serrated steak knives, were not found in plain view  one behind a chair in the bedroom and the other on the right side of a sofa cushion which was slightly askew. According to the Atlantic County Medical Examiner, Doctor Hydow Park, Lark's death was caused by "multiple blunt and sharp force injuries to the head, neck, and upper torso areas." These included numerous stabbing and cut wounds to her head, face, neck, back, hands, and chest. Additionally, Lark had a large open skull fracture around her left eye caused by a heavy object.
Phillip Beesley, a Senior Forensic Scientist with the Department of Law and Public Safety Forensic Science Section (the Department), testified that swabbings taken from various locations in the apartment tested positive for blood and tissue and were submitted for DNA testing, along with blood samples taken from the victim and defendant. Patricia Prusak, also a Senior Forensic Scientist employed by the Department, found defendant's DNA matched one of the specimens taken from the apartment and also matched the source mixed with Lark's DNA on two other specimens taken from the apartment.
Officer Howard Mason and several other officers went to defendant's home. Mason noticed that defendant had a cut on his hand that was bleeding. Defendant claimed that he was injured when he fell from his bicycle. He also stated that he had not left his house the entire night. Defendant claimed that he had not been in Lark's apartment since the last week in December 1998.
Robinson told police that defendant left her apartment at approximately 2:40 a.m. and made a great deal of noise when he returned between 3:00 and 3:30 a.m. Two of defendant's fingerprints were found on the handle of the frying pan found next to Lark's body. A bloodstained glove belonging to defendant and used by him to lift weights was recovered from Lark's apartment.
At trial, Defendant admitted that he left his house at about 2:30 a.m. to purchase some marijuana. Victor Winters, a witness called by defendant, acknowledged selling marijuana to defendant and smoking it with him for about half an hour. Defendant denied referring to Lark as a "bitch" and a "whore" during the alleged incident at the county jail. Defendant also denied threatening Lark in a conversation with Lark's mother. He also claimed that approximately a week after he was released from jail and a week to ten days before the murder he saw Lark at a party at his cousin's house. According to defendant, there was no confrontation or ruckus *26 between them. They had a brief conversation concerning whether she aborted her child. He claimed that they really did not interact and "would just pass each other by without too much conversation at all."
On appeal, defendant raises the following points
POINT I
THE EVIDENCE PRESENTED TO THE JURY CREATED A RATIONAL BASIS FOR A VERDICT CONVICTING DEFENDANT OF THE LESSER INCLUDED OFFENSE OF PASSION/PROVOCATION MANSLAUGHTER. THE COURT'S FAILURE TO GRANT DEFENDANT'S REQUEST FOR A JURY INSTRUCTION ON THE LESSER OFFENSE DENIED DEFENDANT HIS FEDERAL AND STATE CONSTITUTIONAL RIGHTS TO A FAIR TRIAL AND DUE PROCESS OF LAW. (U.S. CONST. AMEND. VI, XIV; N.J. CONST. ART. I, PAR. 1, 9, 10.)
POINT II
NUMEROUS INSTANCES OF PROSECUTORIAL MISCONDUCT DEPRIVED DEFENDANT OF HIS DUE PROCESS RIGHT TO A FAIR TRIAL. (U.S. CONST. AMEND. XIV; N.J. CONST. (1947) ART. I, PAR. 10.) (Not Raised Below.)
A. The Prosecutor's Repeated Comments That Defendant And His Alibi Witness Were Liars Was Improper.
B. The State Improperly Denigrated The Defense.
POINT III
THE ADMISSION OF GRUESOME CRIME SCENE AND AUTOPSY PHOTOGRAPHS DEPRIVED DEFENDANT OF THE RIGHT TO A FAIR TRIAL. (U.S. CONST. AMEND. VI, XIV; N.J. CONST. ART. I, PAR. 9, 10.)
POINT IV
THE CUMULATIVE EFFECT OF THESE ERRORS DENIED DEFENDANT HIS CONSTITUTIONAL RIGHT TO A FAIR TRIAL AND A NEW TRAIL IS IN ORDER. (Not Raised Below.)
POINT V
AS THE OFFENSES INVOLVED A SINGLE INCIDENT AND A SINGLE VICTIM, THE COURT ERRED IN ORDERING THAT DEFENDANT SERVE A MAXIMUM SENTENCE ON THE BURGLARY WHILE ARMED CONVICTION CONSECUTIVE TO THE MAXIMUM SENTENCE IMPOSED ON THE MURDER CONVICTION.
In a pro se brief, defendant raises the following additional points:
POINT I
THE DENIAL OF THE MOTION TO SUPPRESS THE EVIDENCE SEIZED FROM THE APARTMENT THAT THE DEFENDANT HAD CO-LEASED WITHOUT A SEARCH WARRANT WHERE THERE WAS NO JUSTIFIABLE EXIGENCY WAS A CLEAR VIOLATION OF THE FOURTH AMENDMENT OF THE U.S. CONSTITUTION.
POINT II
THE DEFENDANT WAS DENIED HIS DUE PROCESS RIGHTS TO DNA TESTING PRIOR TO HIS TRIAL THEREFORE THE DEFENDANT'S CASE SHOULD BE REMANDED TO THE TRIAL COURT FOR THE OFFICE OF THE PUBLIC DEFENDER TO PROVIDE FOR THE REQUESTED DNA TESTING TO BE CONDUCTED.
POINT III

*27 THE STATE VIOLATED BRADY BY FAILING TO DISCLOSE THE JAIL TELEPHONE TOLL RECORDS FROM JANUARY 15, 1999 TO FEBRUARY 21, 1999 THAT WERE IN THE STATE'S POSSESSION PRIOR TO DEFENDANT'S TRIAL AND AS A RESULT DEPRIVED DEFENDANT OF HIS DUE PROCESS RIGHTS TO A FAIR TRIAL.
POINT IV
THE TRIAL COURT ERRED IN ALLOWING THE STATE TO INTRODUCE MULTIPLE INSTANCES OF OTHER CRIMES EVIDENCE WITHOUT A PROPER CURATIVE INSTRUCTION THEREFORE THE CONVICTION SHOULD BE REVERSED.
POINT V
THE DEFENDANT WAS DENIED HIS SIXTH AMENDMENT RIGHT TO THE EFFECTIVE ASSISTANCE OF COUNSEL AT HIS TRIAL THEREFORE THE CONVICTION SHOULD BE REVERSED AND REMANDED FOR A NEW TRIAL.
In a supplemental brief, defendant's counsel raises the following additional point:
POINT VI
TRIAL COURT VIOLATED DEFENDANT'S FEDERAL CONSTITUTIONAL RIGHT TO DUE PROCESS AND HIS RIGHT TO A JURY TRIAL WHEN IT SENTENCED HIM TO CONSECUTIVE MAXIMUM TERMS, INCLUDING DISCRETIONARY PERIODS OF PAROLE INELIGIBILITY, BASED UPON FACTS NEITHER ADMITTED BY DEFENDANT NOR FOUND BY THE JURY.

I
Prior to closing arguments, defendant proposed that the judge instruct the jury on aggravated manslaughter as a lesser-included offense of murder. In support of his request, defendant asserted that the evidence presented respecting the numerous telephone calls made by him was consistent with anger, jealousy, and obsession, which bespoke passion/provocation. Denying defendant's request the judge found "that there was some proof of passion but no rational basis for adequate provocation or to conclude that defendant did not have time to cool off."
On appeal, defendant asserts that there was a rational basis to support a jury charge on passion/provocation manslaughter. He points to the State's opening and closing arguments in which the prosecutor told the jury that defendant "in his rage" murdered Lark and that defendant was "angry" and "furious."
N.J.S.A. 2C:1-8e directs that "[t]he court shall not charge the jury with respect to an included offense unless there is a rational basis for a verdict convicting the defendant of the included offense." See State v. Sinclair, 49 N.J. 525, 540, 231 A.2d 565 (1967). When a defendant requests a charge on a lesser offense, the trial judge must focus on the facts in evidence "to ensure that there is a rational basis for a jury to reject the greater charge and convict of the lesser" charge. State v. Brent, 137 N.J. 107, 116, 644 A.2d 583 (1994). Moreover, where the evidence reasonably supports defendant's request for a jury charge on a lesser-included offense, a trial court's failure to give it is reversible error. State v. Crisantos, 102 N.J. 265, 278, 508 A.2d 167 (1986).
The elements of passion/provocation manslaughter are: (1) adequate provocation; (2) absence of a cool-off period between the provocation and the slaying; (3) *28 the provocation must have actually impassioned the defendant; and (4) defendant must not have cooled off before the slaying. N.J.S.A. 2C:11-4b(2). The evidence did not support such a charge. See also State v. Mauricio, 117 N.J. 402, 411, 568 A.2d 879 (1990).
The judge correctly determined that the evidence was insufficient to establish adequate provocation at or about the time of the murder or that defendant did not have a reasonable time to cool off. Lark broke off the relationship approximately five months before she was killed. Defendant was angered while he was in jail when he learned in January that Lark was seeing Boswell and that she was pregnant. He was also concerned and tried to dissuade her from terminating her pregnancy. Clearly, there was a sufficient cool-down period between the incidents that occurred while defendant was incarcerated and when Lark was killed.
The subject of her pregnancy came up again at the party held approximately one week before the murder. Although the record is somewhat unclear, defendant may have learned that Lark had terminated her pregnancy. However, there is no evidence that defendant was angered by this turn of events. According to his testimony, there was no confrontation or ruckus between them when they met at the party. More importantly, there is no evidence that the two had any interaction following the party. Even if one could conclude that defendant was angered by Lark's relationship with Boswell or the termination of her pregnancy at the time he saw her at the party, there was more than ample time for defendant to cool off.

II
Defendant argues next that there was plain error because the prosecutor in his summation ridiculed the defense, voiced his opinion that defendant was guilty, and expressly argued that defendant and his alibi witnesses were liars. Specifically, defendant asserts that the following remarks were improper:
(1) [W]e know he lied and we know he lies when it's convenient. He chooses when he's going to be truthful ... when he's going to be honest, whether it's going to hurt him, whether it's going to help him.
(2) So clearly when he says he had no anger towards her, he just wanted to find out about this baby situation ... and everything was cool between them, clearly that's not the truth.
(3) I submit the testimony of Victor Winters is not credible. It was not believable. The first time Mr. Kramer talks to Victor Winters was Monday, last Monday. Victor Winters adds information as he goes along ... I could just see how he's lying.
(4) When you look at it in conjunction with all the other evidence we know he [defendant] was not truthful about how he got those cuts on his hands. Clearly it was a time when he felt he needed to lie. He lied here and he lied to the police.
(5) The defendant can't tell the truth about this because the truth puts him in the middle of a murder....
We briefly describe the applicable legal principles. In reviewing alleged prosecutorial misconduct, we consider: (1) whether defense counsel objected in a timely and proper fashion to the remarks; (2) whether the offending remarks were withdrawn promptly; and (3) whether the court gave the jury curative instructions. State v. Zola, 112 N.J. 384, 426, 548 A.2d 1022 (1988), cert. denied, 489 U.S. 1022, 109 S.Ct. 1146, 103 L. Ed.2d 205 (1989); *29 State v. Setzer, 268 N.J.Super. 553, 566, 634 A.2d 127 (App.Div.1993), certif. denied, 135 N.J. 468, 640 A.2d 850 (1994). Where, as here, the defendant's lawyer fails to object at trial, we may legitimately infer that counsel did not consider the remarks inappropriate or prejudicial. State v. Vasquez, 265 N.J.Super. 528, 560, 628 A.2d 346 (App.Div.), certif. denied, 134 N.J. 480, 634 A.2d 527 (1993). When prosecutorial misconduct is being raised for the first time on appeal, we need only be concerned with whether "the remarks, if improper, substantially prejudiced the defendant['s] fundamental right to have the jury fairly evaluate the merits of [his] defense, and thus had a clear capacity to bring about an unjust result." State v. Johnson, 31 N.J. 489, 510, 158 A.2d 11 (1960). Even where a prosecutor has been guilty of misconduct, reversal of a defendant's conviction is not necessary unless the conduct was so egregious that it deprived the accused of a fair trial. State v. Ramseur, 106 N.J. 123, 322, 524 A.2d 188 (1987), cert. denied, 508 U.S. 947, 113 S.Ct. 2433, 124 L. Ed.2d 653 (1993).
A prosecutor may make comments on the evidence and the inferences that may reasonably be drawn from the proofs. State v. Timmendequas, 161 N.J. 515, 587, 737 A.2d 55 (1999); State v. Frost, 158 N.J. 76, 82, 727 A.2d 1 (1999); State v. Harris, 156 N.J. 122, 194, 716 A.2d 458 (1998); State v. Perry, 65 N.J. 45, 47-48, 319 A.2d 474 (1974). It is inappropriate, however, for a prosecutor to "express his or her personal belief or opinion as to the truth or falsity of any testimony or evidence or the guilt of the defendant." State v. Marshall, 123 N.J. 1, 154, 586 A.2d 85 (1991) (quoting ABA Standards for Criminal Justice § 3-5.8(b) (2d ed.1980)). A prosecutor may, however, suggest that witnesses lied, or suggest that witnesses are not credible. State v. Morton, 155 N.J. 383, 457-58, 715 A.2d 228 (1998). This is especially so where there is conflicting evidence or reasonable inferences can be drawn from the evidence presented during the trial. Ibid. We note that, in evaluating any claim of error, we are obliged to recognize that a prosecutor may argue the State's case in a forceful manner. Setzer, supra, 268 N.J.Super. at 565, 634 A.2d 127.
The prosecutor did not offer a personal opinion of defendant's veracity, or refer, explicitly or implicitly, to matters outside of the record but instead commented, in light of the conflicting evidence, that defendant and Winters were not truthful. Moreover, the trial judge instructed the jury that the comments of counsel were not evidence and were not controlling. Credibility was hotly contested by the defense and the prosecutor's statements were made in response to the defense's position. State v. Engel, 249 N.J.Super. 336, 379, 592 A.2d 572 (App.Div.), certif. denied, 130 N.J. 393, 614 A.2d 616 (1991).
Arguing that the State improperly denigrated the defense, defendant points to the following statements in the prosecutor's closing remarks:
Now during the testimony of the defendant it reminded me of a documentary that I saw recently.... And it was a documentary on the octopus. Now the octopus is an animal that has a very unusual defense mechanism and that's called an ink pack and when an octopus becomes afraid, when he becomes fearful because an enemy may be coming near, he releases that ink pack. The purpose of releasing that ink pack ... is to muddy the waters so you can't see clearly, so you can't see through the mud and he tries to use that muddy water to escape. And that's what we saw from the defendant when he was on the witness stand. He's got an answer for every piece of evidence in this case. *30 He's a victim of circumstances from witnesses who mishear things to ... police who are planting evidence.
Officer Francisco must be part of this police ... conspiracy to set this defendant up, along with all the other people that we heard that must have been part of this extravagant convoluted conspiracy to set this defendant up.
If they [the police] don't remember something, they're lying. They're trying to hide things. There's a conspiracy behind every door.
Every piece of evidence that ties this defendant to the crime was because of trickery, lying, deceit, everybody wants to be on the team.
She knew she was going to die that evening and she decided [to say] that the defendant was outside her window just to set him up when she's in the after life. I mean how ridiculous does that have to be to believe  the defense theory?
Now if the State is so corrupt and these investigators are so corrupt, why aren't they pouring her blood onto his clothes... ?
And all the police officers that ... were there must have been in on this conspiracy. That's what the defense wants you to believe.
Again, we disagree. A prosecutor is not permitted to attack, disparage, or demean adverse counsel, either directly or indirectly. State v. Thornton, 38 N.J. 380, 397, 185 A.2d 9 (1962), cert. denied, 374 U.S. 816, 83 S.Ct. 1710, 10 L. Ed.2d 1039 (1963); State v. Adams, 320 N.J.Super. 360, 370, 727 A.2d 468 (App.Div.) certif. denied, 161 N.J. 333, 736 A.2d 526 (1999). Nor is a prosecutor permitted to "cast unjustified aspersions" upon defense counsel. Tabor v. O'Grady, 59 N.J.Super. 330, 340, 157 A.2d 701 (App.Div.1960). However, a prosecutor is permitted to respond to arguments raised by the defense so long as it does not constitute a foray beyond the evidence adduced at trial. State v. Johnson, 287 N.J.Super. 247, 266, 670 A.2d 1100 (App.Div.) (citing State v. Wilson, 128 N.J. 233, 241-42, 607 A.2d 1289, (1992)), certif. denied, 144 N.J. 587, 677 A.2d 759 (1996)). Here, the prosecutor was forcefully responding to defendant's assertions. We do no believe that his remarks in response to the defense were unjustified or sufficiently egregious to deprive defendant of a fair trial. R. 2:10-2.

III
Next, defendant contends that admission of color photographs shown on a television screen, depicting the scene of the crime and the autopsy, were gruesome, unnecessary, and denied defendant of his right to a fair trial. He argues that the explicit description by the police and the medical examiner were sufficient to inform the jury in graphic detail of the numerous wounds and injuries suffered by the victim. Defendant asserts that the judge erred in determining that the photographs had probative value and were not unduly inflammatory.
"The admissibility of photographs of a crime victim rests within the discretion of the trial judge and his ruling will not be overturned in the absence of a palpable abuse of that discretion." State v. Micheliche, 220 N.J.Super. 532, 544-45, 533 A.2d 41 (App.Div.1987) (citing State v. Thompson, 59 N.J. 396, 420, 283 A.2d 513 (1971)). Such photographs "become inadmissible only when their probative value is so significantly outweighed by their inherently inflammatory potential as to have a probable capacity to divert the minds of the jurors from a reasonable and fair evaluation of the basic issue of guilt or *31 innocence." State v. Sanchez, 224 N.J.Super. 231, 249-50, 540 A.2d 201 (App.Div.1988). The exclusion of photographs is not justified because they are cumulative evidence. Micheliche, supra, 220 N.J.Super. at 545, 533 A.2d 41.
The State has the burden of showing a purposeful and knowing murder. Although gruesome, the photographs were "legitimately a part of the State's proof of defendant's criminal state of mind." Ibid. The photographs of the crime scene showed the location of the body, the weapons, and bloodstains. There was a photograph of the broken frying pan handle with defendant's fingerprints on it in close proximity to the victim. As we pointed out in Micheliche, the photographs were probative to show the jury "that the attack was performed with such convulsive ferocity that it could only have been the product of a knowing purpose to cause death." Ibid.
In light of what we have said regarding defendant's first three points, we need not address his Point IV argument that the cumulative effect of the error asserted in Points I, II, and III requires us to grant a new trial. Suffice it to say this contention is without merit. R. 2:11-3(e)(2).

IV
We turn next to defendant's argument that the imposition of a consecutive ten-year term with five years of parole ineligibility on the third count burglary conviction was improper and excessive. Where circumstances are such that defendant is "the type of repetitive offender [who] is not likely to be rehabilitated," consecutive sentencing may be appropriate for protection of the public. State v. Mosch, 214 N.J.Super. 457, 464, 519 A.2d 937 (App.Div.1986).
In State v. Yarbough, 100 N.J. 627, 643-44, 498 A.2d 1239 (1985), our Supreme Court enumerated the following criteria to be considered in determining whether to impose consecutive or concurrent sentences:
(1) there can be no free crimes in a system for which the punishment shall fit the crime;
(2) the reasons for imposing either a consecutive or concurrent sentence should be separately stated in the sentencing decision;
(3) some reasons to be considered by the sentencing court should include facts relating to the crimes, including whether or not:
(a) the crimes and their objectives were predominantly independent of each other;
(b) the crimes involved separate acts of violence or threats of violence;
(c) the crimes were committed at different times or separate places, rather than being committed so closely in time and place as to indicate a single period of aberrant behavior;
(d) any of the crimes involved multiple victims;
(e) the convictions for which the sentences are to be imposed are numerous;
(4) there should be no double counting of aggravating factors;
(5) successive terms for the same offense should not ordinarily be equal to the punishment for the first offense; and
(6) there should be an overall outer limit on the cumulation of consecutive sentences for multiple offenses not to exceed the sum of the longest terms (including an extended term, if eligible) that could be imposed for the two most serious offenses.
The Legislature displaced the sixth factor, effective August 5, 1993, providing *32 that there "shall be no overall outer limit on the cumulation of consecutive sentences for multiple sentences." N.J.S.A. 2C:44-5(a)(2). In any event, the focus should be on the fairness of the overall sentence, and the sentencing judge should set forth in detail the reasons for concluding a particular sentence is warranted. State v. Miller, 108 N.J. 112, 122, 527 A.2d 1362 (1987). In passing upon the sentence, the judge noted, "this is the most brutal murder that I have seen in over twenty-three years on the bench." He indicated that defendant committed these crimes shortly after he "maxed out" on his previous eighteen-year term on drug offenses, and pointed out that he was "the same man who laughed and smirked at the victim's family during the course of the proceedings leading up [to] and during trial." In the same vein, Shelby Lark's testimony revealed that when defendant threatened to kill Lark he stated that he was not afraid to go back to jail. The judge in his statement of reasons demonstrated that he indeed considered relevant circumstances, including the severity of the offense and the need to impose consecutive sentences to protect society from someone who is likely to resort to criminal behavior to further his anti-social lifestyle. Under these circumstances, the imposition of consecutive sentences did not violate the Yarbough guidelines and was an appropriate exercise of judicial discretion. See Mosch, supra, 214 N.J.Super. at 464-466, 519 A.2d 937.
Likewise, we are satisfied that the sentence imposed on the first count and third count convictions is not manifestly excessive or unduly punitive and does not constitute an abuse of discretion. State v. O'Donnell, 117 N.J. 210, 215-16, 564 A.2d 1202 (1989); State v. Ghertler, 114 N.J. 383, 393, 555 A.2d 553 (1989); State v. Roth, 95 N.J. 334, 363-65, 471 A.2d 370 (1984).

V
In his supplemental brief, defendant contends that the trial judge erred in denying his motion to suppress evidence seized in the apartment where the victim was found. He argues that he had an interest in the apartment and, therefore, a search warrant should have been obtained. Applying the Fourth Amendment standard, the judge found that defendant had no standing to bring a motion to suppress because he had no expectation of privacy in the apartment. The judge also found that the police were properly in the apartment, given the emergent circumstances, and that the items found, except for two, were in plain view.
In State v. Alston, 88 N.J. 211, 224-26, 440 A.2d 1311 (1981), the Court parted company with the United States Supreme Court concept of standing, which espoused that even the assertion of ownership of the property seized under certain circumstances is not sufficient to confer Fourth Amendment standing of a legitimate expectation of privacy. Alston involved the search of the passenger compartment of an automobile in which two revolvers were found belonging to passengers. Id. at 217, 440 A.2d 1311. Concluding that "[l]egitimate expectations of privacy are those that flow from some connection with or relation to the place or property to be searched," the Alston Court held that Article I, paragraph 7 of the New Jersey constitution provides greater protection because a "criminal defendant is entitled to bring a motion to suppress evidence obtained in an unlawful search and seizure if he has a proprietary, possessory, or participatory interest in either the place searched or the property seized." Id. at 227-28, 440 A.2d 1311.
The trial judge did not find defendant's testimony that he signed the lease to *33 Lark's apartment, paid the rent, and had an ongoing relationship with her to be credible. In reaching his finding, the judge noted that defendant produced no receipt, no check, no money order, and no lease evidencing his claim that he had an interest in the apartment. The judge found that defendant did not live in Lark's apartment at the time and that his relationship with her ended in December 1998 or early January 1999, at which time Lark changed the locks to her apartment. When defendant was asked for his address he gave the address he shared with Robinson.
Where a judge's factual findings could reasonably have been reached on sufficient credible evidence present in the record it is improper for us to interfere. State v. Johnson, 42 N.J. 146, 162, 199 A.2d 809 (1964); see also State v. Locurto, 157 N.J. 463, 474, 724 A.2d 234 (1999). On this record, there was sufficient credible evidence to conclude that defendant did not have a proprietary, possessory, or participatory interest in Lark's apartment. Unlike Alston, we are not dealing with an interest in the property seized but rather the property searched. Although the judge mistakenly relied upon the Fourth Amendment standard (expectation of privacy rather than proprietary, possessory, or participatory interest), we find no error. Discounting defendant's testimony as not credible, defendant did not establish either standard.
Additionally, the search and seizure was not violative of the Fourth Amendment. "[A] police officer lawfully in the viewing area" is not expected to "close his eyes to suspicious evidence in plain view." State v. Bruzzese, 94 N.J. 210, 237, 463 A.2d 320 (1983). Here, the police were properly at the scene of a crime involving a reported homicide, there was probable cause to believe that all the evidence seized was associated with the criminal activity, and all but two items were in plain view. Coolidge v. New Hampshire, 403 U.S. 443, 91 S.Ct. 2022, 29 L.Ed.2d 564 (1971). In Mincey v. Arizona, 437 U.S. 385, 98 S.Ct. 2408, 57 L.Ed.2d 290 (1978), the Court discussed and held that there was no explicit murder or crime scene exception. Instead, the Mincey Court recognized that officers who arrive at a crime scene to assist a victim of a homicide where there is reason to suspect foul play are properly on the premises. Id. at 392, 98 S.Ct. 2408. Moreover, the Court held that officers properly on the premises to investigate a homicide are permitted to conduct a search for other crime victims or criminals and may seize any evidence that is in plain view during the course of such legitimate emergency activities. Id. at 393, 98 S.Ct. 2408; State v. Faretra, 330 N.J.Super. 527, 533-534, 750 A.2d 166 (2000).
The judge found that the officers were properly on the premises pursuant to a legitimate emergency entry and the evidence seized, except for the two serrated steak knives, fit the plain view exception. The judge also noted that all the items would have inevitably been found because Lark's next of kin consented to a search of the apartment for a handgun.
We are satisfied that the record here established that defendant did not have standing to challenge the search, that the search conducted essentially "demonstrates a permissible entry followed by a plain-view observation of incriminating evidence," and that there was a valid consent to search by a person with authority over the premises, which would have led to "the inevitable discovery of all the evidence seized." Faretra, supra, 330 N.J.Super. at 535, 750 A.2d 166 (citing State v. Sugar, 100 N.J. 214, 495 A.2d 90 (1985)). Accordingly, *34 the order to suppress was properly denied.

VI
In Point III of his pro se brief, defendant contends that the State turned over phone records evidencing some 467 telephone calls for the period between February 22 and April 3, 1999. He argues that the State suppressed evidence favorable to him, specifically, the telephone records for the period between January 1 and February 22, 1999. He claims that those phone records would have corroborated his testimony that he learned that Lark was pregnant and she threatened to terminate the pregnancy if he did not leave Robinson. Defendant's claim simply lacks merit. The record reveals that all phone records involving defendant's pin number were moved into evidence. Moreover, even if they were not, defendant would have been fully aware of the telephone calls made by him and he could have readily obtained the records or moved to have the State produce them.

VII
Likewise without merit is defendant's contention in Point IV of his pro se brief that the introduction of numerous phone calls made by him from the Atlantic County Jail, together with the evidence that he and Boswell argued while their respective girlfriends were visiting them at the jail, amounts to evidence of prior crimes, contrary to N.J.R.E. 404(b). There was no evidence of defendant's prior crime, merely reference to the fact that he was in jail when these relevant events occurred. Moreover, the judge provided the following appropriate limiting instruction.
And you'll recall that during the trial you heard testimony of an incident that occurred while the defendant was at the Atlantic County Justice Facility or that [he] had some form of relationship to that facility and as I told you at the beginning of the trial, and I'll remind you now, this information is not to be used to in any way show that the defendant's a bad person or that he is disposed to commit crimes. An innocent person can be in jail simply by reason of an inability to make bail on a given charge. Whatever brought the defendant to the justice facility is totally irrelevant to your deliberations in this case and you should not speculate about it.... You should not consider this in your deliberations in any way. This evidence is before you solely for the limited purpose as it pertains ... to the evidence introduced to show motive or purpose for the alleged offense and it is to be used for no other purpose.

VIII
In Point II and Point V, defendant also contends, pro se, that he was denied due process because his trial attorney failed to request and follow up with a request for DNA testing and was further denied ineffective assistance of counsel based upon his trial attorney's failure to investigate and call crucial defense witnesses during his suppression hearing and trial. Allegations respecting advice obtained from counsel that involve assertions and evidence beyond the trial record are best addressed on an application for post-conviction relief. State v. Preciose, 129 N.J. 451, 460, 609 A.2d 1280 (1992); State v. Ospina, 239 N.J.Super. 645, 656, 571 A.2d 1373 (App.Div.), certif. denied, 127 N.J. 321, 604 A.2d 597 (1990). We therefore defer further consideration.

IX
We next address the contention raised in the supplemental briefs that *35 defendant was denied his right to have a jury determine the imposition of consecutive maximum term sentences. Relying primarily upon the recent United States Supreme Court decision in Blakely v. Washington, ___ U.S. ___, 124 S.Ct. 2531, 159 L.Ed.2d 403 (2004), defendant asserts he was denied his Sixth Amendment right to have a jury determine the essential facts for imposition of a maximum statutory term, a parole bar, and consecutive sentences.
Ralph Howard Blakely, who had been diagnosed with various psychological and personality disorders, abducted his wife Yolanda from their Washington home. He bound Yolanda with duct tape, forced her at knifepoint into a wooden box in the bed of his pickup truck, and drove her to a friend's house in Montana in an attempt to dissuade her from prosecuting the divorce action. Before he left, the couple's thirteen-year-old son Ralphy returned from school. The defendant ordered Ralphy to follow him in another car, threatening that he would harm Yolanda with a shotgun if he did not do so. Id. at 2534.
Blakely eventually pled guilty to second-degree kidnapping involving domestic violence and use of a firearm. Id. at 2534-35. Under the plea agreement, the prosecutor recommended a standard range sentence. Id. at 2535. The "standard range" sentence under the Washington Sentencing Reform Act (SRA) was forty-nine to fifty-three months. Ibid. However, the SRA also permits a judge to impose a sentence above the standard upon a finding of "substantial and compelling reasons to justify an exceptional sentence." Ibid. (quoting Wash. Rev.Code Ann. §§ 9.94A.120(2) (2000)). Although the act listed aggravating factors justifying departure from the standard, Washington case law provided that "[a] reason offered to justify an exceptional sentence can be considered only if it takes into account factors other than those which are used in computing the standard range sentence for the offense." Ibid. (quoting State v. Gore, 143 Wash.2d 288, 315-16, 21 P.3d 262 (2001)).
The judge rejected the State's recommendation, finding that the defendant acted with "deliberate cruelty" and imposed an exceptional sentence of ninety months after hearing Yolanda's description of the crime. Ibid. The defendant objected to the sentence, which exceeded the plea agreement. Ibid. Following a three-day bench trial, which consisted of testimony from various witnesses, the judge adhered to his initial findings of deliberate cruelty and re-imposed the ninety-month sentence. Id. at 2536-36.
Noting in Blakely that "[t]his case requires us to apply the rule we expressed in Apprendi v. New Jersey, 530 U.S. 466, 490, 120 S.Ct. 2348, 147 L.Ed.2d 435 (2000)," Justice Scalia writing for the majority stated:
Other than the fact of a prior conviction, any fact that increases the penalty for a crime beyond the prescribed statutory maximum must be submitted to a jury, and proved beyond a reasonable doubt.
[Blakely, supra, ___ U.S. at ___, 124 S.Ct. at 2536 (emphasis added).]
In Apprendi, the defendant pled guilty to second-degree possession of a firearm for an unlawful purpose for firing several shots into an African-American's home. The State moved for an extended term pursuant to N.J.S.A. 2C:43-7 and 2C:44-3(e), permitting an enhanced penalty of up to twenty years, contending that the offense was committed because of racial bias. Following a hearing, the judge imposed an extended term of twelve years. The majority held that it violated due process for the Legislature to remove from a jury the assessment of facts, beyond a reasonable doubt, which increased a prison *36 term from a range imposed for a second-degree crime to that imposed for a first-degree crime. In reaching its decision, however, the Apprendi Court stated:
We should be clear that nothing in this history suggests that it is impermissible for judges to exercise discretion, taking into consideration various factors relating both to offense and offender, in imposing a judgment within the range prescribed by statute. We have often noted that judges in this country have long exercised discretion of this nature in imposing sentences within statutory limits in the individual case.
[Apprendi, supra, 530 U.S. at 481, 120 S.Ct. 2348 (citations omitted).]
Initially, we note that here, unlike in Blakely and Apprendi, the imposition of a life sentence with thirty years of parole ineligibility was "within the statutory range," of knowing and purposeful murder, N.J.S.A. 2C:11-3b(1), as was the ten-year-term for second-degree burglary, N.J.S.A. 2C:43-6a. Unlike the Washington statutes, our statutes relevant to this appeal provide for standard ranges, rather than an enhanced term beyond the maximum, which can only be imposed upon a finding that the offense involved an additional element like "deliberate cruelty."
Defendant argues that under Blakely the standard sentence cannot exceed the presumptive term without a jury determining the aggravating factors that justify upwards departure. In other words, defendant asserts that the maximum term that can be imposed under our statute, without jury involvement, is the presumptive sentence. In support of his contention, defendant relies on the following excerpts from the majority's opinion in Blakely, defining statutory maximum.
Our precedents make clear, however, that the "statutory maximum" for Apprendi purposes is the maximum sentence a judge may impose solely on the basis of the facts reflected in the jury verdict and admitted by the defendant

....
In other words, the relevant "statutory maximum" is not the maximum sentence a judge may impose after finding additional facts, but the maximum he may impose without any additional findings.
[Blakely, supra, ___ U.S. at ___, 124 S.Ct. at 2537.]
Addressing the types of findings that offend the Sixth Amendment, Justice Scalia pointed out:
Whether the judge's authority to impose an enhanced sentence depends on finding a specific fact (as in Apprendi), one of several specified facts (as in Ring) or any aggravating fact (as here) it remains the case that the jury's verdict alone does not authorize the sentence. The judge acquires that authority only upon finding some additional fact.
[Id. at 2538.]
As we have previously stated, our statutory scheme provides a standard range within which aggravating factors are used to determine a term beyond the presumptive. Neither N.J.S.A. 2C:11-3b(1) (providing for a term of thirty years to life for murder) nor N.J.S.A. 2C:43-6a (providing five to ten years for second-degree offenses with a presumptive term of seven years) provides for enhanced terms above the maximum within the standard range. Accordingly, we do not agree with defendant's contention that a presumptive term is the maximum sentence that can be imposed without a jury finding, beyond a reasonable doubt, the existence of certain aggravating factors. However, even if we agreed with defendant's contention, there remain other considerations that lead us to the inescapable conclusion that the circumstances *37 here do not justify our intervention on a constitutional basis.
The Washington statute invalidated by Blakely provided for a judicial finding of deliberate cruelty, an additional offense-based element, beyond the bare elements of the offense charged. Blakely and Apprendi specifically excepted a prior conviction as a fact that must be submitted to a jury. Blakely, supra, ___ U.S. at ___, 124 S.Ct. at 2536. Moreover, Blakely suggested that the types of facts that should be subject to jury determination are those that go "beyond the bare elements of the offense." Id. at 2538 n. 8.
The factors enumerated by the judge, as well as his findings, were set forth in the Judgment of Conviction:
The court finds aggravating factors 1, 3, 6, and 9 and no mitigating factors apply to this sentence. This is the most brutal murder the court has seen in over twenty-three years on the bench. Defendant stabbed and bludgeoned the victim. Six knives were either bent or broken. A cast iron frying pan, an electric frying pan, a wooden rolling pin, and an electric iron and a ceramic lamp were also smashed and broken over the victim's head and body. Defendant has a prior history of domestic violence. He has previously violated parole. This is a vicious dangerous defendant. Society needs to be protected from him. Accordingly, a consecutive sentence is imposed on the non-merging burglary count. An eighteen-year prison term imposed on a prior offense did not deter defendant. He violated parole on that offense and committed this murder shortly after being released when he "maxed out." In response to defendant's allocution, he is the same man who laughed and smirked at the victim's family during trial. His sympathy at sentencing rings hollow.
The only offense-based aggravating factor found by the judge was N.J.S.A. 2C:44-1a(1):
The nature and circumstances of the offense, and the role of the actor therein, including whether or not it was committed in an especially heinous, cruel, or depraved manner.
The remaining aggravating factors, 3 (the risk that the defendant will commit another offense), 6 (the extent of the defendant's prior criminal record), and 9 (the need for deterring the defendant and others from violating the law), N.J.S.A. 2C:44-1(3), (6) and (9), are offender-based factors. Logically they fall within the recidivism exception outlined in both Blakely and Apprendi as they stem from a common origin, namely the defendant's criminal record. See Carson v. State, 813 N.E.2d 1187 (Ind.Ct.App.2004) (holding that aggravating circumstances derivative of defendant's criminal history do not implicate the Blakely analysis). State v. Dixon, 346 N.J.Super. 126, 140, 787 A.2d 211 (App.Div.2001) (holding that persistent offender extended term is not in violation of Apprendi because it falls within the "criminal history" exception). Blakely points out that increased judicial discretion in sentencing should not be "at the expense of the jury's traditional function of finding the facts essential to lawful imposition of a penalty," thus implying that the relevant factors are those which embrace traditional elements of an offense, not the defendant's propensity to engage in criminal conduct.
In crafting the Judgment of Conviction, the trial judge spelled out the nature and circumstances of the murder as the basis for applying the offense-based aggravating factor, namely, that the murder was committed in an especially heinous, cruel, or depraved manner. He did not apply aggravating factor 1 to the second-degree burglary. He found the remaining offender-based *38 factors applicable to both convictions. Thus, the judge's finding of aggravating factors 3, 6, and 9 used to justify the maximum second-degree ten-year term did not offend Blakely, as they were derived from defendant's prior criminal record and, therefore, expressly excepted.
We turn our attention to the life sentence imposed on the murder conviction and whether the finding that the murder was committed in an especially heinous, cruel, or depraved manner offends Blakely as asserted by defendant. Our analysis begins with the recognition that our statutory scheme provides that there is no presumptive term for murder. N.J.S.A. 2C:44-1f(1). N.J.S.A. 2C:11-3b(1) provides in pertinent part:
Murder is a crime of the first degree but a person convicted of murder shall be sentenced ... to a term of 30 years, during which the person shall not be eligible for parole, or be sentenced to a specific term of years which shall be between 30 years and life imprisonment of which the person shall serve 30 years before being eligible for parole.
We pointed out in State v. Manzie, 335 N.J.Super. 267, 271, 762 A.2d 276 (App.Div.2000) aff'd, 168 N.J. 113, 773 A.2d 659 (2001), that
[a]lthough murder is characterized as a crime of the first degree, N.J.S.A. 2C:11-3b(1), it is rarely, if ever, analyzed as a first degree crime because the murder statute establishes a discrete sentencing scheme, which deviates substantially from the sentencing options applicable to first degree crimes.
We also noted in Manzie"[m]urder is the only crime for which life imprisonment is an available ordinary sentence." Id. at 275, 762 A.2d 276; see also State v. Serrone, 95 N.J. 23, 27, 468 A.2d 1050 (1983) (holding that life imprisonment for murder is an ordinary term). Therefore, unlike first-, second-, third-, and fourth-degree offenses, murder has it own "discrete" scheme similar to the example found acceptable in Blakely:
In a system that says the judge may punish burglary with 10 to 40 years, every burglar knows he is risking 40 years in jail. In a system that punishes burglary with a 10-year sentence, with another 30 added for use of a gun, the burglar who enters a home unarmed is entitled to no more than a 10-year sentence  and by reason of the Sixth Amendment the facts bearing upon that entitlement must be found by a jury.
[Blakely, supra, ___ U.S. at ___, 124 S.Ct. at 2540.]
Thus, defendant's assertion that a judicial finding that the murder was committed in an especially heinous, cruel, or depraved manner, like the deliberate cruelty factor in Blakely, is constitutionally invalid because it represents an enhanced sentence above the presumptive term misses the mark. Firstly, as we have previously pointed out, the life term does not represent an enhancement of a sentence beyond the standard range set forth in the murder statute. Secondly, because the crime of murder has no presumptive term, defendant, like every murderer, "knows he is risking" life in prison. Ibid. Thirdly, even if we were to conclude that the offense-based aggravating factor found here does not survive Blakely, its application is harmless, beyond a reasonable doubt, because the remaining offender-based aggravating factors, together with the absence of any mitigating factors, are sufficient to justify the sentence imposed.
Finally, we address defendant's contention that the factors used to support imposition of parole ineligibility and consecutive terms should be determined by a jury. Both Blakely and Apprendi involved *39 a single offense. Neither dealt with, nor are they applicable to, the determination of consecutive sentences. See People v. Sykes, 120 Cal.App. 4th 1331, 16 Cal.Rptr.3d 317 (2004) (noting that the historical and jurisprudential basis for the Blakely and Apprendi holdings did not involve consecutive sentencing). Although the imposition of consecutive terms and a five-year term of parole ineligibility, N.J.S.A. 2C:43-6b, increase defendant's punishment, they do not increase the penalty above what the law provides for the offense charged. See Harris v. United States, 536 U.S. 545, 562, 122 S.Ct. 2406, 2416-17, 153 L.Ed.2d 524, 541 (2002) (plurality opinion). We are satisfied that the sentence imposed does not suffer from the constitutional infirmities proscribed by Blakely.
Affirmed.