**NOT FOR PUBLICATION WITHOUT THE
APPROVAL OF THE APPELLATE DIVISION**

This opinion shall not "constitute precedent or be binding upon any court." Although it is posted on the internet, this opinion is binding only on the parties in the case and its use in other cases is limited. R. 1:36-3.

SUPERIOR COURT OF NEW JERSEY
APPELLATE DIVISION
DOCKET NO. A-3806-19

STATE OF NEW JERSEY,

    Plaintiff-Respondent,

v.

CHRISTOPHER UDELL TEETER,
a/k/a UDELL TEETER,

    Defendant-Appellant.

_____

Argued March 20, 2023 – Decided April 11, 2024

Before Judges Haas and Gooden Brown.

On appeal from the Superior Court of New Jersey, Law Division, Burlington County, Indictment No. 18-12-1746.

Taylor Louise Napolitano, Assistant Deputy Public Defender, argued the cause for appellant (Joseph E. Krakora, Public Defender, attorney; Taylor Louise Napolitano, of counsel and on the brief).

Lauren Bonfiglio, Deputy Attorney General, argued the cause for respondent (Matthew J. Platkin, Attorney General, attorney; Lauren Bonfiglio, of counsel and on the brief).

The opinion of the court was delivered by

GOODEN BROWN, J.A.D.

Following a jury trial, defendant Christopher Teeter was convicted of first-degree attempted murder, second- and third-degree aggravated assault, and related weapons offenses stemming from him stabbing his co-driver, Paul Stephens, four times in the chest with a knife after a verbal altercation at a truck stop during a long-haul trucking job.  In addition to Stephens's testimony, the State's proofs at trial included police body-worn-camera video footage depicting Stephens's injuries in the aftermath of the stabbing.[1]  The defense theory, conveyed through cross-examination, opening, and summations, was that defendant acted in self-defense.  After the verdict was rendered, defendant was sentenced to an aggregate term of twenty years in prison, subject to an eighty-five percent period of parole ineligibility pursuant to the No Early Release Act (NERA), N.J.S.A. 2C:43-7.2.

---

[1]  The exact number of stab wounds inflicted upon Stephens is unclear from the record.  During his testimony, Stephens recounted that defendant "slashe[d] [him], . . . the first time with the knife," then "proceed[ed] to [stab him] three more times."  The treating trauma surgeon testified that "[he] counted five" stab wounds, "[f]our that were clear stab wounds and one that was kind of . . . a superficial . . . abrasion."

On appeal, defendant raises the following points for our consideration:

POINT I

THE TRIAL COURT ERRED BY ADMITTING VIDEO OF STEPHENS OUTSIDE OF THE STORE MOANING AND SHAKING AND DISPLAYING NOT ONLY HIS STAB WOUNDS BUT HIS BLOODY T-SHIRT. AND THE COURT ERRED IN FAILING TO GRANT A MISTRIAL AFTER THE STATE'S REASONS FOR ADMITTING THE VIDEO PROVED FALSE.

    A.    The Video Should Have Been Excluded as Cumulative and Prejudicial.

    B.    Mistrial Should Have Been Granted After the July [2019] Statement Came to Light.

POINT II

[DEFENDANT'S] RIGHT TO A FAIR TRIAL WAS DENIED WHEN THE TRIAL COURT FAILED TO: (A) DISMISS JUROR NO. 10 EVEN THOUGH SHE FEARED FOR HER SAFETY AFTER REPEATED THREATS BY JUROR NO. 1; (B) ASK JUROR NO. 10 IF SHE HAD SPOKEN WITH ANY OTHER JURORS ABOUT JUROR NO. 1'S THREATS; (C) VOIR DIRE THE REMAINING JURORS ABOUT THEIR COMMUNICATIONS WITH JUROR NO. 10; AND (D) VOIR DIRE A DIFFERENT JUROR REGARDING THE IMPACT OF FINANCIAL HARDSHIP ON HER SERVICE. (NOT RAISED BELOW[).]

    A.    Juror No. 10.

3

B. The Juror Who Inquired About Compensation for Childcare Cost.

POINT III

[DEFENDANT] WAS DENIED HIS RIGHT TO A FAIR TRIAL WHEN THE COURT DELIVERED A SELF-DEFENSE CHARGE THAT FAILED TO SPECIFY TO WHICH CHARGES IT APPLIED OR TO CONVEY THAT THE STATE HAD THE BURDEN TO DISPROVE SELF-DEFENSE AS AN ELEMENT OF THOSE OFFENSES.  (NOT RAISED BELOW[).]

POINT IV

IN VIOLATION OF STATE V. BRUNSON, 132 N.J. 377 (1993), THE TRIAL COURT FAILED TO ORDER THAT [DEFENDANT'S] PRIOR ASSAULT CONVICTION BE SANITIZED EVEN THOUGH THIS CASE INVOLVED TWO ASSAULT CHARGES.

POINT V

[DEFENDANT] WAS DENIED HIS RIGHT TO A FAIR TRIAL WHEN THE PROSECUTOR ARGUED IN CLOSING THAT SHE WAS "CERTAIN" THAT [DEFENDANT'S] BLOOD ON HIS OWN SHOELACES DID NOT COME FROM THE DAY OF THE OFFENSE, WHICH WAS CONTRARY TO THE EVIDENCE AT TRIAL AND UNDERMINED [DEFENDANT'S] CLAIM THAT HE ACTED IN SELF-DEFENSE.  (NOT RAISED BELOW[).]

POINT VI

EVEN IF THE COURT FAILS TO REVERSE ON POINTS 1 THROUGH V, [DEFENDANT'S] RIGHTS TO DUE PROCESS AND A FAIR TRIAL WERE DENIED BY THE CUMULATIVE EFFECT OF THOSE ERRORS. (NOT RAISED BELOW).

POINT VII

[DEFENDANT'S TWENTY]-YEAR SENTENCE IS EXCESSIVE GIVEN THAT IT RELIES ON CONFLICTING AGGRAVATING AND MITIGATING FACTORS AND ON AGGRAVATING FACTORS UNRELATED TO THE OFFENSE.

Based upon our review of the record and the applicable legal principles, we reject defendant's arguments and affirm.

I.

On December 20, 2018, defendant was charged in a five-count Burlington County indictment with first-degree attempted murder, N.J.S.A. 2C:5-1(a)(1), and N.J.S.A. 2C:11-3(a)(1) and (2) (count one); second-degree aggravated assault, N.J.S.A. 2C:12-1(b)(1) (count two); third-degree aggravated assault, N.J.S.A. 2C:12-1(b)(2) (count three); third-degree possession of a weapon for an unlawful purpose, N.J.S.A. 2C:39-4(d) (count four); and fourth-degree unlawful possession of a weapon, N.J.S.A. 2C:39-5(d) (count five).

A five-day jury trial was conducted in July 2019, during which the State produced thirteen witnesses, including the victim, truck stop employees, responding police officers, the treating trauma surgeon, and a DNA analyst. Although defendant provided written notice pursuant to Rule 3:12-1 that he intended to invoke N.J.S.A. 2C:3-4(a), and submitted a proffer that the use of force on Stephens "was the result of . . . defendant's reasonable belief" that "force was immediately necessary for the purpose of protecting himself against the unlawful force" of Stephens, defendant did not testify or produce any witnesses at trial. We glean these facts from the trial record.

Defendant and Stephens were both drivers employed by Covenant Trucking Company (Covenant). They had been paired together as a driving team and had driven "about 70,000 miles" together with no prior history of issues between them. On October 11, 2018, after making a delivery in Monroe, New Jersey, they proceeded to the Petro Truck Stop, a large truck stop in Bordentown, to observe a mandatory rest period. Their trip together had begun on September 18, 2018.

Stephens testified that the long driving hours required drivers to sleep in the "sleeper compartment" of the tractor trailer and urinate into spare bottles inside the truck instead of "pull[ing] over." The common practice was for

6

drivers to discard the urine-filled bottles when they stopped or place them "under the seat." However, according to Stephens, defendant would often "pee in McDonald['s] cups . . . and leave them on the bed," or "leave his pee bottles in the seat," causing "pee" to "splash[] everywhere" while they drove. Although defendant had done this on prior trips, Stephens had given him "the benefit of the doubt" and had not said anything to him. However, when Stephens woke up in the truck on the morning of October 12, 2018, and found "a piss bottle in [his] seat," Stephens became "upset" and resolved to address it with defendant.

Stephens proceeded to the truck stop's restaurant, the Iron Skillet, for breakfast. After Stephens ordered and was waiting for his food, defendant walked past him to leave the restaurant, having already eaten. As defendant passed, Stephens confronted him, telling him that he "need[ed] to quit leaving pee bottles in the seat" and "need[ed] to go clean it up." Defendant became "irate," retorting that he had "never called [Stephens] out in public like that." The argument continued until defendant left the restaurant. Stephens remained to eat his food. An Iron Skillet cashier who had observed the interaction authenticated a surveillance video of the encounter taken from the restaurant's surveillance system. The video was played for the jury at trial.

A-3806-19

According to Covenant records, shortly after defendant left the restaurant, he sent a mobile data terminal message from the truck to the company requesting an immediate transfer and a new co-driver. In the message, defendant stated he was "not taking this load with [Stephens]" because Stephens had "just disrespected [him] in public at the [truck stop] in [New Jersey]." Stephens was unaware of the communication between defendant and Covenant.

After finishing his meal at the Iron Skillet, Stephens returned to the truck where the argument continued to escalate. During the verbal altercation, Stephens recalled engaging in an exchange of derisive name calling with defendant, but denied hitting, threatening, or brandishing a weapon at defendant. After defendant gathered his things from "the front of the truck," both men exited the truck from opposite sides. Stephens "thought . . . that the little argument was over." However, to his surprise, defendant "c[ame] around the driver's side of the truck" with a knife in his hand and "slashe[d]" Stephens. Defendant then proceeded to "stab [Stephens] three more times."

Stephens testified that the last blow "weakened" him and he fled towards the truck stop's convenience store in search of help, leaving a trail of blood in his path. Convenience store employees called 9-1-1, helped Stephens to the ground, and applied pressure to his wounds. Surveillance footage of the

8

interaction at the convenience store was also played for the jury. After police officers arrived, they took over Stephens's medical care until an ambulance crew arrived and drove Stephens to the hospital.

Bordentown Township Police Officer Erich Hess was the first officer to respond and render first-aid to Stephens while awaiting medical personnel. His body-worn-camera recorded his entire interaction with Stephens. A shortened version consisting of about five minutes of the body-worn-camera footage was played for the jury during the trial over defendant's objection. After Stephens was removed from the scene by medical personnel, store employees cleaned up the blood trails left behind until they were ordered to stop by the responding officers.

At the hospital, Stephens underwent multiple surgeries to treat his wounds. Stephens remained on a ventilator in the intensive care unit for two to three weeks, and was not released from the hospital until November 15, 2018. The treating trauma surgeon described Stephens's injuries as "life threatening," and recounted that Stephens was stabbed once in the "right upper chest," twice in the "abdomen," and once "on the right flank on the side." He testified that when Stephens arrived at the hospital, he was in "hemorrhagic shock" and had

lost so much blood that "he most likely would have died" if he was not operated on quickly.

After Stephens was transported to the hospital, officers arrested defendant in the rear lot of the convenience store and recovered a knife from a bag inside the truck.[2] Inside the bag "right next to the knife" was "a piece of mail" addressed to defendant. As the officers placed defendant under arrest, defendant made "some spontaneous statements stating what truck he was with, what his trucking number was[, and] . . . that h[e] and his co-driver had gotten into it th[at] morning over the truck being dirty and a pee bottle in the truck." During the booking process, although defendant complained of "an abrasion or scratch on his right arm," no cuts, bruises, abrasions, or injuries were observed on defendant.

A buccal swab was taken from defendant during processing for DNA testing. In addition, defendant's clothing, including his shoes and shoelaces "with suspected blood stains," along with the victim's blood-soaked clothing were collected and sent to the New Jersey State Police Laboratory for analysis. The knife found in the truck was also forwarded for testing. Subsequent testing

---

[2] Stephens testified that the knife recovered from the bag "look[ed] like" the knife defendant had used to stab him.

confirmed the presence of blood on defendant's right shoe, both shoelaces, and the knife blade. The blood found on the knife blade matched Stephens's DNA profile. The blood found on the shoe also matched Stephens's DNA profile but the blood found on one of the shoelaces matched defendant's DNA profile.

On July 31, 2019, the jury found defendant guilty on all counts. On November 8, 2019, defendant was sentenced to a twenty-year prison term, subject to NERA, on count one, and a concurrent eighteen-month term on count five. The remaining counts were merged into count one. A conforming judgment of conviction was entered on November 18, 2019, and this appeal followed.

II.

In Point I, defendant argues the judge "erred by admitting Officer Hess' graphic body camera video of Stephens" after he was stabbed. Defendant asserts the footage was "irrelevant, cumulative and unduly prejudicial."

"[A] trial court's evidentiary rulings are entitled to deference absent a showing of an abuse of discretion, i.e., there has been a clear error of judgment." State v. Singh, 245 N.J. 1, 12 (2021) (alteration in original) (quoting State v. Nantambu, 221 N.J. 390, 402 (2015)). Accordingly, "[t]he 'admissibility of photographs of the victim of a crime rests in the discretion of the trial court, and

11

the exercise of its discretion will not be reversed in the absence of a palpable abuse thereof.'" State v. Johnson, 120 N.J. 263, 297 (1990) (quoting State v. Thompson, 59 N.J. 396, 420 (1971)). Videos are encompassed within the meaning of "photographs" as defined by N.J.R.E. 1001(b).

N.J.R.E. 403 permits the exclusion of relevant evidence "if its probative value is substantially outweighed by the risk of . . . (a) [u]ndue prejudice, confusion of issues, or misleading the jury; or (b) [u]ndue delay, waste of time, or needless presentation of cumulative evidence." Evidence is relevant when it has a "tendency in reason to prove or disprove any fact of consequence to the determination of the action." N.J.R.E. 401; see State v. Buckley, 216 N.J. 249, 261 (2013) ("Evidence need not be dispositive or even strongly probative in order to clear the relevancy bar."). "When a court decides whether evidence is relevant, 'the inquiry should focus on the logical connection between the proffered evidence and a fact in issue.'" State v. Cole, 229 N.J. 430, 447 (2017) (quoting State v. Bakka, 176 N.J. 533, 545 (2003)).

"To determine the admissibility of evidence under N.J.R.E. 401 and 403, the trial court conducts a fact-specific evaluation of the evidence in the setting of the individual case." Id. at 448. "The party urging the exclusion of evidence under N.J.R.E. 403 retains the burden 'to convince the court that the N.J.R.E.

12

403 considerations should control.'" State v. Santamaria, 236 N.J. 390, 406-07 (2019) (quoting Rosenblit v. Zimmerman, 166 N.J. 391, 410 (2001)). When we review a trial court's application of N.J.R.E. 403, "a trial court's weighing of probative value against prejudicial effect 'must stand unless it can be shown that . . . its finding was so wide of the mark that a manifest denial of justice resulted.'" Cole, 229 N.J. at 449 (quoting State v. Carter, 91 N.J. 86, 106 (1982)).

Here, on the first day of trial testimony, defendant objected to the State's introduction of Officer Hess' body-worn-camera video depicting Stephens's injuries while the officers rendered first-aid. Defense counsel argued that the video was "graphic," "gruesome," and would "only serve to inflame the passions of the jury." Defense counsel also observed that because there were several witnesses who could testify about the crime scene, the video was "cumulative." The prosecutor responded that the video was necessary because there were no crime scene photographs or photographs of Stephens's injuries. The prosecutor explained that the crime scene was contaminated by the cleaning efforts of the convenience store employees and, given his condition, Stephens was rushed to the hospital before photos were taken. Further, according to the prosecutor, the video showed the severity of the victim's injuries, which the State was required

to prove, and its value was compounded by the fact that Stephens "[did not] remember much" after the stabbing.

The judge overruled defendant's objection and allowed the video to be played for the jury. The judge noted that he had reviewed the video and acknowledged that it showed the aftermath of the stabbing, including Stephens's wounds, the blood, and the treatment rendered "by several police and/or paramedics and EMTs." However, the judge concluded that the video was "relevant to the issues in the case" and its probative value was not substantially outweighed by the N.J.R.E. 403 factors. In support, the judge pointed out that the video "was[ not] extremely long" and the blood depicted was not "excessive."

The judge also explained:

> I do not think at this point that its unduly prejudicial. I think its probative value is outweighed by any potential risk of prejudice. As the State has pointed out that the victim was unable to testify as to what happened because of lack of memory due to blood loss or whatever else, the video would help in that regard, and . . . I don't find it to be so bloody or grotesque that it would inflame the passions of the jury.

On the second day of trial, after the video had been played for the jury, defendant renewed his objection. Defense counsel argued that the prosecutor's representation that Stephens did not recall the details of the stabbing, based in

14

part on the statement Stephens had given while he was still hospitalized, was proven false by a more recent statement that counsel had received that day in which Stephens had "set[] forth in detail what had happened to him." Counsel urged that if the judge agreed, then a mistrial would be warranted.

The prosecutor countered that although the recent statement contained more details about the events leading up to the stabbing, it "had nothing to do with [Stephens's] recollection of when he[ was] laying on the floor" immediately after the stabbing. Moreover, the recent statement was merely an investigation report memorializing a telephone conversation between Stephens and prosecutor's office staff in preparation for trial. In the report, Stephens attributed his failure to previously recall details of the attack to being in a coma and heavily medicated at the hospital.

The judge rejected defendant's argument, explaining:

> Even if this report was known to the defense prior to the video being played, the [c]ourt still would have allowed the video to be played for the following reasons:
>
> Number one, I do believe that the video goes to the nature of the injuries, the extent of the injuries. It goes to the treatment that the victim received as a result of the stabbing. To the extent that the crime scene was cleaned by the staff at the Iron Skillet, the video also goes to display the crime scene at the time of treatment of the victim.

15

A-3806-19

> Whether or not . . . and I don't recall that the [c]ourt placed much weight on the fact that the victim had no recollection or had . . . an impaired recollection of the events, I'm not sure I put much weight on that. But to the extent I did, I still believe for all the other reasons stated that the video was permissible to be shown.

We agree with the judge's rulings. "The relevancy determination requires that we consider the statutory elements that the State must prove." Buckley, 216 N.J. at 262. Count one of the indictment required the State to prove that defendant attempted to "cause[] death or serious bodily injury resulting in [the] death" of Stephens. N.J.S.A. 2C:5-1(a)(1); N.J.S.A. 2C:11-3(a)(1) and (2). Counts two and three required the State to prove that defendant "cause[d] serious bodily injury" to Stephens, N.J.S.A. 2C:12-1(b)(1), or "cause[d] bodily injury to [Stephens] with a deadly weapon," N.J.S.A. 2C:12-1(b)(2). As such, the severity of Stephens's injuries as well as the amount of pain Stephens endured were material issues. The footage was also relevant for evaluating defendant's criminal state of mind and self-defense claim. From it, "the jury could infer that the attack was performed with such convulsive ferocity that it could only have been the product of a knowing purpose to cause death." State v. Micheliche, 220 N.J. Super. 532, 545 (App. Div. 1987).

16

To support his argument, defendant focuses on the "undue prejudice" prong of Rule 403.  However,

> [i]n determining whether the admission of certain evidence would be unduly prejudicial, a court considers whether the evidence's probative value "is so significantly outweighed by [its] inherently inflammatory potential as to have a probable capacity to divert the minds of the jurors from a reasonable and fair evaluation of the basic issue of guilt or innocence." [Thompson, 59 N.J. at 421.]  For exclusion, the evidence must be more than prejudicial:  "[d]amaging evidence usually is very prejudicial but the question here is whether the risk of undue prejudice was too high." Cole, 229 N.J. at 448 (alteration in original) (quoting State v. Morton, 155 N.J. 383, 453-54 (1998)).
>
> [State v. Trinidad, 241 N.J. 425, 449 (2020) (second and fourth alteration in original).]

Here, we are satisfied that the risk of undue prejudice was not so high as to justify exclusion.  The video was the only photographic record of Stephens's injuries, further underscoring its value to the State.  Although evidence was presented through other witnesses, the video provided valuable insight into the viciousness of the attack and the gravity of Stephens's injuries, which Stephens himself could not fully recall during his trial testimony.  Indeed, contrary to defendant's assertion and consistent with the July 2019 report, at trial, following the stabbing, Stephens could only recall entering the convenience store, an EMT asking him his name, and a "real vague memory" of the emergency room.

17

Critically, the judge found the video was not so gruesome in content nor excessive in length as to render it inadmissible. Given our deferential standard of review, we discern no clear error of judgment. See Morton, 155 N.J. at 453-54 ("The mere possibility that evidence could be prejudicial does not justify its exclusion."); Micheliche, 220 N.J. Super. at 545 ("Although all pictures of a murdered body are likely to be unpleasant and cause emotional stirring, that of itself does not render them inadmissible."). But see Johnson, 120 N.J. at 296-98 (explaining that where medical examiner had already testified about cause of death and extent of injuries to the victims, the introduction of forty-six photographs of the victims' bodies covered with blood "created a substantial danger of undue prejudice to defendant"); State v. Taylor, 350 N.J. Super. 20, 35-36 (App. Div. 2002) (finding "error in the admission of a three minute and ten second surveillance videotape, submitted pursuant to N.J.R.E. 804(b)(2), when in fact only the final few seconds contained the victim's 'dying declaration,' the content of which had been attested to by at least three other witnesses").

We also reject defendant's argument that the video should have been excluded because it was cumulative. Generally speaking, "[t]he exclusion of photographs is not justified because they are cumulative evidence." State v.

Abdullah, 372 N.J. Super. 252, 271 (App. Div. 2004) (citing Micheliche, 220 N.J. Super. at 545), rev'd on other grounds, 184 N.J. 497 (2005). Instead, "[s]uch photographs 'become inadmissible only when their probative value is so significantly outweighed by their inherently inflammatory potential as to have a probable capacity to divert the minds of the jurors from a reasonable and fair evaluation of the basic issue of guilt or innocence.'" Id. at 270-71 (quoting State v. Sanchez, 224 N.J. Super. 231, 249-50 (App. Div. 1988)). "Inflammatory evidence 'must be excluded if other probative, non-inflammatory evidence exists.'" Santamaria, 236 N.J. at 406 (quoting Green v. N.J. Mfrs. Ins. Co., 160 N.J. 480, 500 (1999)).

Here, the judge found that the video was not "so bloody or grotesque that it would inflame the passions of the jury." We discern no abuse of discretion in the judge's finding and no error in the admission of the video. Notwithstanding the fact that other witnesses testified about Stephens's condition after the stabbing, his injuries were depicted in the video far more effectively than through mere testimony. See Abdullah, 372 N.J. Super. at 270 (rejecting the defendant's contention that crime scene and autopsy color photographs were unduly inflammatory despite testimony from police officers and a medical examiner that presented an "explicit description . . . in graphic detail of the

numerous wounds and injuries suffered by the victim"); cf. Robert Schiavo v. Owens-Corning Fiberglas Corp., 282 N.J. Super. 362, 368-69 (App. Div. 1995) (holding that "a videotape depicting a day in the life" of the plaintiff who was suffering from mesothelioma was "far more effective[] than . . . mere testimony" on "'the nature and extent of'" the plaintiff's injuries and therefore not unnecessarily cumulative (quoting Jones v. City of Los Angeles, 24 Cal. Rptr. 2d 528, 531 (Cal. Ct. App. 1993))).

Defendant also argues that the judge erred in failing to grant a mistrial. However, given our decision on the admissibility of the video, we need not address the mistrial argument. See R. 2:11-3(e)(2).

### III.

In Point II, defendant asserts the judge erred in his handling of two separate issues related to members of the jury. The first concerned an interpersonal issue between Jurors 10 and 1 that resulted in Juror 1's dismissal. The second concerned a juror's inquiry regarding reimbursement for childcare expenses. Defendant contends that "[b]ecause both circumstances were extraneous matters" capable of "distract[ing] those jurors from the evidence at trial and render[ing] them partial," the judge should have dismissed the jurors.

Both the Federal and State Constitutions guarantee criminal defendants "the right to . . . trial by an impartial jury." State v. Brown, 442 N.J. Super. 153, 179 (App. Div. 2015) (omission in original) (quoting U.S. Const. amends. VI, XIV; N.J. Const. art. I, ¶ 10). "That constitutional privilege includes the right to have the jury decide the case based solely on the evidence presented at trial, free from the taint of outside influences and extraneous matters." Ibid. (quoting State v. R.D., 169 N.J. 551, 557 (2001)). Indeed, "[j]ury 'irregularity,' . . . may violate a defendant's federal and state constitutional rights to a fair tribunal if it results in prejudice." State v. Mohammed, 226 N.J. 71, 83 (2016) (quoting State v. Scherzer, 301 N.J. Super. 363, 486-87 (App. Div. 1997)).

"[A]ll doubts about a juror's integrity or ability to be fair should be resolved in favor of removing the juror from the panel." State v. Loftin, 191 N.J. 172, 187 (2007). After the jurors are sworn but before deliberations, "the court for good cause shown may excuse any of them from service provided the number of jurors is not reduced to less than [twelve] or [six] as the case may be." R. 1:8-2(d)(1).

> When "it becomes apparent that a juror may have been exposed to extraneous information, the trial court must act swiftly to overcome any potential bias and to expose factors impinging on the juror's impartiality." [R.D., 169 N.J.] at 557-58 (citing State v. Bey, 112 N.J. 45, 83-84 (1988)).

A-3806-19

> The court is obliged to interrogate the juror, in the presence of counsel, to determine if there is a taint; if so, the inquiry must expand to determine whether any other jurors have been tainted thereby. The trial court must then determine whether the trial may proceed after excusing the tainted juror or jurors, or whether a mistrial is necessary.
>
> [Id. at 558 (citing Pressler, Current N.J. Court Rules, comment 2 on R. 1:16-1 (2000)).]

[Brown, 442 N.J. Super. at 182.]

We "review[] the trial court's jury-related decisions under the abuse of discretion standard" because of the trial court's "unique perspective and the traditional deference we accord to trial courts in 'exercising control over matters pertaining to the jury.'" Ibid. (quoting R.D., 169 N.J. at 560). However, we are "not bound by a determination when the 'particular circumstances present such a strong likelihood of prejudice that, as a matter of law,' the juror should have been removed." Loftin, 191 N.J. at 192 (quoting State v. Biegenwald, 106 N.J. 13, 91 (1987)).

We now turn to the specific jury-related issues in dispute. On the third day of trial, in the presence of the other jurors, Juror 10 told the judge that she "ha[d] a question regarding other jurors here that [she] kn[ew]." Outside the

presence of the other jurors but with counsel present, Juror 10 informed the judge that Juror 1 had "threatened" her and her "ten[-]year[-]old daughter" about a month or two prior to the trial. Although she had "never met [Juror 1] before in [her] life," she explained that "[Juror 1] ha[d] a relationship with a friend . . . who was doing drugs" and Juror 10 had decided to "cut them out of [her] life." According to Juror 10, after she made her decision, Juror 1 "threatened" her.

The judge asked Juror 10 whether she felt "uncomfortable serving on the jury," to which the juror responded that "[her] heart [was] racing." Juror 10 also disclosed additional details about Juror 1, including the fact that he had "ruined" the friend's "life" by posting "inappropriate" comments about her "on line." The judge then asked whether "continuation on this jury [would] be a problem" for her given the circumstances. Juror 10 answered, "I don't think that I'd have a problem judging the information and taking that into consideration. But like I said, my heart is racing."

When the judge attempted to clarify Juror 10's concerns, the following exchange occurred:

> THE COURT: Okay. All right. . . . What I'm hearing from you is that you think you could still be fair and objective with respect to the facts in this case.
>
> JUROR NUMBER 10: Definitely.

23

THE COURT: But given the history between you and Juror Number 1 that you feel a little uneasy I guess if you guys were in deliberati[on] together; would that make you feel uneasy?

JUROR NUMBER 10: I think that I'm still going to give my opinion as to how I feel my opinion would be.

THE COURT: Okay.

JUROR NUMBER 10: But I don't think I'd have to fight — anyway, I'll give my opinion.

After consulting with counsel, the judge questioned Juror 1 with the attorneys present. Upon questioning, Juror 1 acknowledged that he knew Juror 10 "by name," but not "by face," because she used to work with his girlfriend at a hardware store. When the judge inquired whether he had made any threats to Juror 10 in their prior interactions, Juror 1 denied the accusation but stated that he would "not feel comfortable" remaining on the jury in light of the accusation. With the agreement of counsel, the judge excused Juror 1 and instructed the remaining jurors "not to . . . have any discussions about Juror . . . 1 leaving or the reason that he's left, [because] it's not pertinent to the case."

The next day, the judge alerted counsel that he had received a voicemail message from Juror 10 the night before that required discussion on the record. Juror 10 then informed the judge and counsel that after Juror 1 was excused, he began sending her "really long text messages" stating that he had "NSA," "CIA,"

24

and "prosecutor's office" connections and that he could "damage" her "reputation and ruin [her] life." He also threatened to "get a copy of the transcript and sue [her] for . . . [libel]." While the judge reviewed the messages, Juror 10 explained that Juror 1 "text[ed] from all different numbers" and "ha[d] a way of routing [the messages]."

Juror 10 ultimately declared, "I can't even read all of it because it just gets to the point where it's just lunacy." She maintained that she was "not in any way affected as far as feeling that [she] would [not] be impartial" and explained that she brought the messages to the judge's attention because she did not want "any of this information to then be problematic at some point if [Juror 1] d[id] end up showing up at [her] house or anything."

The judge read some parts of the messages into the record, while summarizing others, as follows:

> THE COURT: Okay. So at this point I do have [Juror 10]'s phone. There is an extremely lengthy message. And given the context of everything that happened yesterday, it seems like it is from Juror Number 1. It's too much to read into the record. But suffice it to say, he says that he knows that [Juror 10] won't be able to answer this text right now because she's busy performing her civic duty, and ["]this number will be fried before you can reply to it anyway,["] which leads me to believe it's from Juror Number 1.

25

It goes on to say, he's a subcontractor for the federal government, just not in the capacity of the intelligence community because [he's] a computer expert self[-]taught and [his] task with the government was going to be digitally erasing people . . . . [He] can digitally erase people or digitally f*** with them or digitally frame them or digitally make it look like they did things.

So that's the tenor of the text message here. And . . . he also says, ["]what I don't like is people assuming information when I hear a third party and them not coming to me and asking me about it and then saying it in like the Superior Court. Luckily I informed [the judge] of whom I was going to work for and he respects that. And he knows that I am beyond reproach because of my current job as a subcontractor for the federal government. So he did kind of shake off what you said as baseless accusations. However, please don't say those things about me. You don't know me and I've never communicated with you other than that one time I saw you in the hardware store.["]

The judge again asked Juror 10 whether she was "comfortable remaining on th[e] jury" in light of Juror 1's behavior. Juror 10 responded that she was "fine with it as long as everyone [was] aware." After confirming that Juror 10's concern was "more of a personal concern for [her] safety," the judge again asked, "do you believe you can still be fair and impartial if you were to continue to serve?" Juror 10 answered, "I completely do." The judge sent Juror 10 to the sheriff's department to be interviewed in connection with Juror 1's text

26

messages.  Upon her return, the judge again confirmed whether she "still [felt] that [she was] able to serve on th[e] jury" and Juror 10 answered, "[y]es."

The judge placed an oral decision on the record, stating he was

> comfortable . . . having [Juror 10] continue to serve on the jury.  She's communicated that she can still be fair and impartial.  And her concern, as is the [c]ourt's concern, is more for her personal welfare.

When the jury returned to the courtroom, the judge instructed them that,

> [t]he [c]ourt . . . ha[d] to deal with a matter . . . that [was] unrelated to any substantive issue in the trial. You're not to speculate about the reason for the delay this morning.  You're only to consider the evidence seen and heard in this courtroom.

At no point did defense counsel object to the manner in which the judge was handling the juror issues or request a different remedy.

On appeal, defendant now argues that the judge's handling of Juror 10 was flawed in two respects:  first, Juror 10 should have been dismissed especially after she received the text messages because the threats "were an outside influence bearing on Juror . . . 10's ability to concentrate on the evidence"; and second, the jurors should have been questioned to determine whether Juror 10 had discussed Juror 1 with other jurors.  Because defendant raises these issues for the first time on appeal, we review for plain error.

27

"[A]n unchallenged error constitutes plain error if it was 'clearly capable of producing an unjust result.'" State v. Clark, 251 N.J. 266, 287 (2022) (quoting R. 2:10-2). "Plain error is a high bar and constitutes 'error not properly preserved for appeal but of a magnitude dictating appellate consideration.'" Santamaria, 236 N.J. at 404 (quoting State v. Bueso, 225 N.J. 193, 202 (2016)). Generally speaking, "[a] new trial will be granted where jury misconduct or intrusion of irregular influences into the jury deliberation 'could have a tendency to influence the jury in arriving at its verdict in a manner inconsistent with the legal proofs and the court's charge.'" State v. Wormley, 305 N.J. Super. 57, 69 (App. Div. 1997) (alteration in original) (quoting State v. Grant, 254 N.J. Super. 571, 583 (App. Div. 1992)).

On this record, defendant has not satisfied the high standards required for granting a new trial. Defendant has presented no evidence to suggest that the judge deviated from established principles regarding jury management, or that Juror 1's threats actually distracted Juror 10 from her deliberative role. When a juror has been exposed to outside influence, the trial judge must "consider the gravity of the extraneous information in relation to the case, the demeanor and credibility of the juror[,] . . . who w[as] exposed to the extraneous information, and the overall impact of the matter on the fairness of the proceedings." R.D.,

169 N.J. at 559. The judge also "must act swiftly to overcome any potential bias and to expose factors impinging on the juror's impartiality." Id. at 558.

The record shows that upon learning of the issue, the judge thoroughly questioned both jurors to ascertain the nature and extent of their relationship, took immediate steps to prevent their conflict from affecting deliberations, and asked Juror 10 no fewer than three separate times whether she could remain fair and impartial and continue to serve. Juror 10 answered in the affirmative each time. Defendant suggests that the judge erred in accepting Juror 10's answers because the threats were so "bizarre, extreme, and disturbing" that Juror 10 simply could not have been a competent juror.

However, "the trial court is in the best position to determine whether the jury has been tainted." Id. at 559. Absent circumstances that "'"present such a strong likelihood of prejudice that, as a matter of law," the juror should have been removed,'" a trial judge's decisions regarding jury management are entitled to deference. Brown, 442 N.J. Super. at 182 (quoting Loftin, 191 N.J. at 192). Applying that deferential standard of review, we discern no basis to intervene. Juror 1's threats had nothing to do with the question of defendant's guilt or innocence, nor did they appear calculated to influence Juror 10's vote in any way. Indeed, even before Juror 1 was excused, Juror 10 never indicated that his

29

threats made her afraid to vote her mind. After Juror 1 was excused, Juror 10 was unequivocal about her ability to remain impartial, even in light of the threatening messages.

As our courts have recognized, "'[i]t is virtually impossible to shield jurors from every contact or influence that might theoretically affect their vote.'" R.D., 169 N.J. at 559 (quoting Smith v. Phillips, 455 U.S. 209, 217 (1982)). "A new trial . . . is not necessary in every instance where it appears an individual juror has been exposed to outside influence." Ibid. Guided by these principles, we are satisfied that allowing Juror 10 to remain on the jury did not rise to the level of plain error.

Defendant also argues that the judge erred in failing to discern what, if anything, the other jurors knew about the conflict between Jurors 1 and 10, and asserts that prejudice should be presumed. However, "[i]n a criminal case, a presumption of prejudice attaches when there is 'any private communication, contact, or tampering, directly or indirectly, with a juror during a trial about the matter pending before the jury." Scherzer, 301 N.J. Super. at 487 (emphasis added) (quoting Remmer v. United States, 347 U.S. 227, 229 (1954)). Moreover, not every instance involving potential jury taint requires individual voir dire of all other jurors. R.D., 169 N.J. at 560-61. Indeed, if, after

questioning the supposedly tainted juror, the judge is satisfied that it is not necessary to voir dire the other jurors, that determination is reviewed for abuse of discretion.  Id. at 561.

Ideally, the judge should have asked Juror 10 if she had discussed her connection to Juror 1 with the other members of the jury during his initial inquiry.  See R.D., 169 N.J. at 560 ("An appropriate voir dire of a juror . . . should inquire into the specific nature of the extraneous information, and whether the juror intentionally or inadvertently has imparted any of that information to other jurors.").  Moreover, the judge should have explained on the record his decision to not question the other jurors.  Id. at 560-61 (stating that, if the judge is satisfied that further voir dire is not necessary, "[t]hat determination should be explained on the record to facilitate appellate review").

However, under the circumstances, we do not believe these oversights rise to the level of plain error.  The judge made no finding that Juror 10 was tainted by her connection to Juror 1.  Thus, once Juror 1 was excused, there was no need to voir dire the remaining jurors.  Pressler & Verniero, Current N.J. Court Rules, cmt. 2.1 on R. 1:16-1 (2024) (noting that obligation to interview other jurors is triggered upon finding that initial juror is tainted); see also State v. Dreher, 302 N.J. Super. 408, 501-02 (App. Div. 1997) (affirming the denial of a new trial

where "[t]here [was] no evidence whatsoever that the jury was subjected to any irregular influences" because "[t]he sole juror who might have learned of the prior verdict was removed, and there was no hint that any other juror had similar knowledge"), overruled on other grounds by State v. Brown, 190 N.J. 144, 159 n.1 (2007). Furthermore, the jury received express instructions to not discuss or speculate about Juror 1's removal, or the delays caused by the judge's discussions with Juror 10 because they were irrelevant to the substantive issues in the case.

Moreover, there is no evidence to suggest that Juror 10 discussed Juror 1 with other jurors. R.D., 169 N.J. at 562 (finding no plain error in failure to sua sponte voir dire remaining jurors because the excused juror had no opportunity to communicate the tainting information to other jurors). Even if she had, the information was unrelated to defendant and had no capacity to influence the result of the trial. See id. at 558 ("'The test is not whether the irregular matter actually influenced the result, but whether it had the capacity of doing so.'" (quoting Panko v. Flintkote Co., 7 N.J. 55, 61 (1951))).

For similar reasons, we reject defendant's arguments regarding the juror seeking reimbursement for childcare expenses. On appeal, defendant asserts the judge abused his discretion "by failing to voir dire [the] juror regarding whether

the cost of childcare was a financial hardship impacting her service."   Once

again, because defense counsel raised no objection, we review for plain error.

At the conclusion of the third day of trial, the judge asked the unidentified

juror to approach the bench.  In the presence of counsel, the following colloquy

ensued:

> THE COURT:  The reason I asked you to stay back. You're a teacher, correct?  What do you do for income during the summer?
>
> THE JUROR:  Nothing.
>
> THE COURT:  Because I . . . understand there were some concerns about compensation for your jury duty.
>
> THE JUROR:  Only because I had to get somebody to watch my son.
>
> THE COURT:  Sure, I understand.  So I did call down to jury management.  They may be able to help you with that.  Basically my understanding is that if you have any type of employment, whether it be babysitting or anything that you can qualify for payment as a juror. But as a ten-month employee, and I feel your pain, my wife's a teacher as well, so I know about the ten-month pay schedule, but the legislature has said if you're a ten-month employee, then you don't qualify for jury pay during the summer.  But if you did have any type of employment whatsoever, then you could get paid.
>
> So I just wanted to let you know about that. Okay. . . .
>
> . . . .

A-3806-19

THE JUROR:  I appreciate it.

There is no record of the juror's initial inquiry.

"Courts have had no difficulty recognizing that a prospective juror may be excused for financial hardship."  State v. Williams, 171 N.J. 151, 164 (2002). "When the issue of financial hardship is brought into focus at an early stage of a criminal proceeding, the balancing of interests allows greater flexibility favoring the prospective juror with the asserted hardship."  Ibid.  In Williams, the Court held that financial hardship can provide a valid basis for dismissing even a deliberating juror.  Id. at 167.  However, the Court noted that before excusing a deliberating juror, "a trial court should determine that the financial hardship is sufficiently significant to justify excusing the juror during deliberations, and would be likely to prevent the juror from concentrating on and participating fully in the deliberations of the jury."  Id. at 168.

Here, the juror never asserted that she was unable to continue due to financial hardship and we do not interpret Williams to require an inquiry by the judge when the mere possibility of a financial hardship exists.  Therefore, we are satisfied that the judge's handling of the juror's inquiry does not rise to the level of plain error.

IV.

In Point III, defendant argues for the first time on appeal that although the judge "delivered the model jury charge on justification, th[e] charge failed to convey to the jury that the State had to disprove self-defense beyond a reasonable doubt before convicting [defendant] of the attempted murder or aggravated assault counts." According to defendant, the judge "never clearly connected that principle to the attempted murder and aggravated assault charges" and "exacerbated" the error "by the verdict sheet, which asked the jury whether [defendant] reasonably believed that he had to use deadly force instead of asking the jury whether the State had disproven that [defendant's] belief was reasonable."

"Appropriate and proper charges to a jury are essential for a fair trial." State v. Lora, 465 N.J. Super. 477, 501 (App. Div. 2020) (quoting State v. Green, 86 N.J. 281, 287 (1981)). "Jury charges must provide a 'comprehensible explanation of the questions that the jury must determine, including the law of the case applicable to the facts that the jury may find.'" State v. Singleton, 211 N.J. 157, 181-82 (2012) (quoting Green, 86 N.J. at 287-88).

If a defendant does not object when a charge is given, as here, "there is a presumption that the charge was not error and was unlikely to prejudice the

35

defendant's case." State v. Montalvo, 229 N.J. 300, 320 (2017) (quoting Singleton, 211 N.J. at 182). When there is no objection, we review for plain error and "disregard any alleged error 'unless it is of such a nature as to have been clearly capable of producing an unjust result.'" State v. Funderburg, 225 N.J. 66, 79 (2016) (quoting R. 2:10-2); see State v. Adams, 194 N.J. 186, 206-07 (2008) ("Generally, a defendant waives the right to contest an instruction on appeal if he does not object to the instructions as required by Rule 1:7-2.").

Plain error in a jury charge is "[l]egal impropriety in the charge prejudicially affecting the substantial rights of the defendant and sufficiently grievous to justify notice by the reviewing court and to convince the court that of itself the error possessed a clear capacity to bring about an unjust result." State v. Camacho, 218 N.J. 533, 554 (2014) (alteration in original) (quoting Adams, 194 N.J. at 207). "Nevertheless, because clear and correct jury instructions are fundamental to a fair trial, erroneous instructions in a criminal case are 'poor candidates for rehabilitation under the plain error theory.'" Adams, 194 N.J. at 207 (quoting State v. Jordan, 147 N.J. 409, 422 (1997)).

In reviewing a jury charge, "[t]he charge must be read as a whole in determining whether there was any error." State v. Torres, 183 N.J. 554, 564 (2005) (citing Jordan, 147 N.J. at 422). In addition, the error "must be evaluated

in light 'of the overall strength of the State's case.'" State v. Walker, 203 N.J. 73, 90 (2010) (quoting State v. Chapland, 187 N.J. 275, 289 (2006)).

> We note also that, "[a]lthough arguments of counsel can by no means serve as a substitute for instruction by the court, the prejudicial effect of an omitted instruction must be evaluated in light of the totality of the circumstances—including all the instructions to the jury, [and] the arguments of counsel."
>
> [Adams, 194 N.J. at 207 (alterations in original) (quoting State v. Marshall, 123 N.J. 1, 145 (1991)).]

"A verdict sheet is intended for recordation of the jury's verdict and is not designed to supplement oral jury instructions." State v. Gandhi, 201 N.J. 161, 196 (2010). When the defendant does not object to an interrogatory on the verdict sheet, we again review for plain error. State v. Vasquez, 265 N.J. Super. 528, 547 (App. Div. 1993). The "inquiry focuses on whether the jury understood the elements [of the offense] as instructed by the judge, and was not misled by the verdict sheet." Gandhi, 201 N.J. at 197. "When there is an error in a verdict sheet but the trial court's charge has clarified the legal standard for the jury to follow, the error may be deemed harmless." State v. Galicia, 210 N.J. 364, 387 (2012).

Here, during the final charge conference, the judge specifically solicited defense counsel's input as to where the self-defense charge should appear.

A-3806-19

Defense counsel responded that he "ha[d] no preference." The judge then informed the parties that he "placed it at the end of the substantive charges," summarized the charge as a whole, and received no objections from either party. Defense counsel's failure to object gives rise to "'a presumption that the charge was not error and was unlikely to prejudice . . . [the] defendant's case.'" State v. Canfield, 470 N.J. Super. 234, 303 (App. Div. 2022) (omission in original) (quoting Montalvo, 229 N.J. at 320).

Defendant's newly minted assertion of prejudice in the self-defense jury charge is belied by the record. Contrary to defendant's argument, the judge expressly correlated the self-defense instruction to the attempted murder and aggravated assault charges. First, in charging the elements of count four, possession of a weapon for an unlawful purpose, the judge delivered a "protective purpose" charge, informing the jury that if it found defendant used the knife to protect himself, the State failed to carry its burden of proof on the "unlawful purpose" element of the offense. Upon completing that instruction, the judge told the jury, "[l]ater on in the charge I will instruct you on the concept of self-defense, as it applies to the offenses of attempted murder, aggravated assault serious bodily injury and aggravated assault bodily injury with a deadly weapon." (Emphasis added).

Further, to the extent defendant asserts that the sequence of the instructions constitutes plain error, that argument is unsupported by law. See State v. Baum, 224 N.J. 147, 167 (2016) ("A judge need not use the precise words or the precise sequence demanded by one party or the other."). Moreover, the fact that the verdict sheet asked the jurors whether defendant "reasonably believe[d]" deadly force was necessary, as opposed to whether the State had disproven the defense, does not rise to the level of plain error. Although "the jury must be instructed that the State is required to prove beyond a reasonable doubt that the self-defense claim does not accord with the facts," "[a]ssuming there is evidence that a defendant acted in self-defense, the jury decides whether [defendant's] belief was honest and reasonable" and "the jury need not find beyond a reasonable doubt that the defendant's belief was honest and reasonable." State v. Burks, 208 N.J. Super. 595, 604 (App. Div. 1986) (citing State v. Kelly, 97 N.J. 178, 198-200 (1984)).

Additionally, although the judge did not expressly reference the facts of the case, read as a whole, the judge's instructions drew a clear relationship between defendant's charges and the concept of self-defense. "It is not plain error when jury instructions are not incorrect but merely capable of being improved." State v. Tierney, 356 N.J. Super. 468, 481 (App. Div. 2003) (citing

39

State v. Delibero, 149 N.J. 90, 106-07 (1997)).  "The test to be applied . . . is whether the charge as a whole is misleading, or sets forth accurately and fairly the controlling principles of law."  State v. Cotto, 471 N.J. Super. 489, 543 (App. Div. 2022) (omission in original) (quoting Baum, 224 N.J. at 159).

Although "'[o]rdinarily, the better practice is to mold the instruction in a manner that explains the law to the jury in the context of the material facts of the case,'" we recently emphasized that "'there is no principle requiring that in every case a court must deliver a specifically tailored instruction relating . . . the facts of the case to the applicable law.'"  Id. at 543-44 (first quoting State v. Concepcion, 111 N.J. 373, 379 (1988); and then quoting State v. T.C., 347 N.J. Super. 219, 240 (App. Div. 2002)).  Instead, "[w]hen the facts are neither complex nor confusing, a court does not have to provide an intricate discussion of the facts in the jury charge" and "not every failure [to tailor jury instructions] is fatal."  Id. at 544 (second alteration in original) (quoting Tierney, 356 N.J. Super. at 482).

Here, the theory of self-defense was straightforward, as was the testimony establishing the facts of the case, and there were no special circumstances that might have warranted a molded instruction.  Even if the instructions could have been more tailored, defendant's failure to object suggests that there was no

prejudice in the omission. In short, defendant's jury charge claims do not rise to the level of plain error.

V.

In Point IV, defendant argues the judge erred in admitting his prior assault conviction for impeachment purposes without ordering that the conviction be sanitized. Defendant asserts the decision was based on the misconception that the prior assault offense and the aggravated assault offenses for which he was on trial were dissimilar. Defendant contends that the error was not harmless because it prevented him from testifying, thereby interfering with his ability to present his own account of the altercation to the jury.

"[W]hether a prior conviction may be admitted into evidence against a criminal defendant rests within the sound discretion of the trial judge," State v. Sands, 76 N.J. 127, 144 (1978), "whose discretion 'is a broad one,'" State v. Murphy, 412 N.J. Super. 553, 564 (App. Div. 2010) (quoting Sands, 76 N.J. at 144). "However, we do not defer to a ruling that is based on a mistaken interpretation of an evidence rule, or that misapplies the rule." State v. R.J.M., 453 N.J. Super. 261, 266 (App. Div. 2018).

N.J.R.E. 609 codifies the rule first announced in Sands.

> Pursuant to N.J.R.E. 609(a), a defendant's prior criminal conviction is admissible for impeachment

41

purposes, unless the defense establishes, pursuant to N.J.R.E. 403, that its admission will be substantially more prejudicial than probative. See N.J.R.E. 403; [State v. T.J.M., 220 N.J. 220, 233 (2015)]; [Kelly, 97 N.J. at 217 n. 21]. However, N.J.R.E. 609(b)(1) creates a presumption that a conviction more remote than ten years is inadmissible for impeachment purposes, unless the State carries the burden of proving "that its probative value outweighs its prejudicial effect."

[R.J.M., 453 N.J. Super. at 266-67.]

In State v. Brunson, the Court modified Sands and created the sanitization rule, holding that:

in those cases in which a testifying defendant previously has been convicted of a crime that is the same or similar to the offense charged, the State may introduce evidence of the defendant's prior conviction limited to the degree of the crime and the date of the offense but excluding any evidence of the specific crime of which defendant was convicted. That method of impeachment will insure that a prior offender does not appear to the jury as a citizen of unassailable veracity and simultaneously will protect a defendant against the risk of impermissible use by the jury of prior-conviction evidence.

[132 N.J. 377, 391 (1993).]

See N.J.R.E. 609(a)(2)(B) (codifying Brunson and providing that if "the court determines that admitting the nature of the offense poses a risk of undue prejudice to a defendant," the defendant may "waive[] any objection to the non-sanitized form of the evidence").

42

Neither similarity nor undue prejudice are specifically defined in either Brunson or N.J.R.E. 609. However, our courts have offered a few examples of when a court should sanitize prior convictions admitted under the rule. First, crimes may be similar enough to trigger the rule when they share common elements. See State v. White, 297 N.J. Super. 376, 381 (App. Div. 1997) (holding that defendant's prior conviction for receiving stolen property required sanitization under Brunson before admission in trial for robbery because both crimes involved theft). Alternatively, similarity may be found when "the nature of the prior crime is such that it includes criminal responsibility for an act . . . which is present in some form in the crimes for which the defendant is being tried." State v. Singleton, 308 N.J. Super. 407, 412 (App. Div. 1998) (deeming prior unlawful possession of a firearm and present violation of a court order by possession of a firearm in a threatening manner sufficiently similar to require sanitization under Brunson).

Additionally, our courts have found that "[u]ndue prejudice . . . can accrue to a defendant when the prior conviction evidence is so similar to the criminal proceedings that brought defendant under the glare of police scrutiny, that the evidence risks unduly prejudicing the jury's fair hearing of the defendant's version of what transpired." State v. Hamilton, 193 N.J. 255, 268 (2008)

43

(determining that sanitization of prior conviction was appropriate when prior conviction involved a crime that "factually resembled" circumstances of investigation leading to present charges).

Here, after the State rested, the judge conducted a <u>Sands</u>/<u>Brunson</u> hearing to determine whether defendant's three prior out-of-state felony convictions would be admissible for impeachment purposes. Specifically, the State sought to introduce: (1) a 1997 conviction for possession with intent to distribute cocaine; (2) a 2007 conviction for making false statements to obtain firearms; and (3) a 2012 conviction for assault and battery, for which defendant received a twelve-month sentence.

After hearing arguments, the judge excluded the 1997 and 2007 convictions as too remote in time, but allowed the State to use the 2012 conviction. The judge also ruled that because the 2012 conviction was "dissimilar" from the present crimes, sanitization was not required. Defendant did not object based on <u>Brunson</u>. After the judge rendered his decision, he questioned defendant regarding his election to testify or remain silent. Defendant indicated to the judge that he intended to testify. However, when the trial resumed six days later, defendant changed his mind and told the judge he would not testify.

Defendant now argues the judge's sanitization ruling was a clear error in judgment. We agree. Defendant's 2012 conviction was for assault and battery of a family member contrary to the laws of Virginia. Under Virginia law, "[a]ny person who commits an assault and battery against a family or household member is guilty of a Class 1 misdemeanor." Va. Code Ann. § 18.2-57.2(A). The offense is completed upon "the least touching of another, willfully or in anger, including touching done in the spirit of rudeness or insult." Marshall v. Commonwealth, 822 S.E.2d 389, 393 (Va. Ct. App. 2019) (quoting Edwards v. Commonwealth, 779 S.E.2d 858, 862 (Va. Ct. App. 2015)); see ibid. ("Whether a touching is a battery depends on the intent of the actor, not on the force applied." (quoting Adams v. Commonwealth, 534 S.E.2d 347, 350 (Va. Ct. App. 2000))).

Counts two and three of the indictment are completed when a person "[a]ttempts to cause serious bodily injury to another, or causes injury purposely or knowingly or under circumstances manifesting extreme indifference to the value of human life recklessly causes such injury," N.J.S.A. 2C:12-1(b)(1), or when a person "[a]ttempts to cause or purposely or knowingly causes bodily injury to another with a deadly weapon," N.J.S.A. 2C:12-1(b)(2). Although

N.J.S.A. 2C:12-1(b) is not specific to family members, it too requires an intentional use of force against another person.

In White, although the prior conviction was a theft offense and the charged offense was robbery, we determined that the offenses were similar enough to warrant sanitization. 297 N.J. Super. at 381-82. The same is true in this case. The mere fact that a prior conviction contains different elements from the charged crimes does not obviate the need to sanitize the prior conviction. Singleton, 308 N.J. Super. at 412 (discussing White). The inquiry is whether they share common elements, as they do here.

Next, we must determine whether the judge's error, that may have caused defendant not to testify, is harmless. In State v. Hedgespeth, our Supreme Court reaffirmed "that there can be situations, although likely unusual, in which an erroneous N.J.R.E. 609 ruling may be deemed harmless even if that ruling resulted in the defendant's deciding not to testify." 249 N.J. 234, 250 (2021). "To determine whether admission of evidence constitutes harmless error, the relevant inquiry is whether the purported error 'is of such a nature as to have been clearly capable of producing an unjust result.'" Id. at 252 (quoting State v. Kuchera, 198 N.J. 482, 501 (2009)). "[T]he harmless-error standard . . . requires that there be some degree of possibility that [the error] led to an unjust result."

State v. Ingram, 196 N.J. 23, 49 (2008) (second alteration in original) (quoting State v. R.B., 183 N.J. 308, 330 (2005)).  "The possibility must be real, one sufficient to raise a reasonable doubt as to whether [it] led the jury to a verdict it otherwise might not have reached."  R.B., 183 N.J. at 330 (alteration in original) (quoting State v. Bankston, 63 N.J. 263, 273 (1973)).

Here, we are satisfied that the judge's error was harmless because the jury's failure to hear defendant's testimony was not clearly capable of producing an unjust result.  The State presented a wealth of evidence to contradict defendant's theory of self-defense.  In proving its case, the State presented testimony from convenience store employees, responding police officers, and the treating trauma surgeon, all of whom testified to the severity of Stephens's wounds.  The introduction of the body-worn-camera footage also provided a graphic depiction of Stephens's injuries.  Critically, testimony from the officer who photographed defendant immediately after his arrest and the corresponding photographs showed no injuries on defendant's body.  Likewise, a search of the crime scene uncovered only one weapon, defendant's knife containing blood that matched Stephens's DNA.  Additionally, testimony from Stephens himself recalling the events leading up to the altercation cast defendant as the aggressor and further detailed the severity of Stephens's injuries.

A-3806-19

Conversely, defendant had no witnesses other than himself to support his self-defense theory, which was the "sort of evidence that a jury naturally would tend to discount as self-serving." State v. Scott, 229 N.J. 469, 484 (2017) (quoting Skipper v. South Carolina, 476 U.S. 1, 8 (1986)). The evidence presented by the State goes beyond simply characterizing the "defense theory . . . as 'implausible,'" Hedgespeth, 249 N.J. at 253 (quoting Scott, 229 N.J. at 484-85), and instead affirmatively disproved it. As such, we believe this is the "unusual" case where an erroneous N.J.R.E. 609 ruling was harmless. Id. at 250.

## VI.

In Point V, defendant contends that it was plain error for the prosecutor to assert, in summation, that she was "'certain' that the blood on [defendant's] shoelaces was not from the date of the offense." Defendant argues the statement contradicted the State's DNA expert's testimony "that there was no way to tell when that blood was shed, lending support to the inference that it could have been shed on the date of the offense and comporting with [defendant's] self-defense claim." According to defendant, the prosecutor's "demonstrably false remark undermined [his] defense."

"'[P]rosecutors in criminal cases are expected to make vigorous and forceful closing arguments to juries' . . . ." State v. McNeil-Thomas, 238 N.J. 256, 275 (2019) (quoting State v. Frost, 158 N.J. 76, 82 (1999)). To that end, prosecutors are "'afforded considerable leeway in closing arguments'" so long as their comments "'stay[] within the evidence and the legitimate inferences [drawn] therefrom.'" Ibid. (first quoting Frost, 158 N.J. at 82; and then quoting R.B., 183 N.J. at 330). Thus, "if a prosecutor's arguments are based on the facts of the case and reasonable inferences therefrom, what is said in discussing them, 'by way of comment, denunciation or appeal, will afford no ground for reversal.'" State v. Smith, 167 N.J. 158, 178 (2001) (quoting State v. Johnson, 31 N.J. 489, 510 (1960)). On the other hand, "making inaccurate factual assertions to the jury" is improper. State v. Garcia, 245 N.J. 412, 435 (2021) (citing Smith, 167 N.J. at 178).

Nonetheless,

> even when a prosecutor's remarks stray over the line of permissible commentary, our inquiry does not end. Rather, we weigh "the severity of the misconduct and its prejudicial effect on the defendant's right to a fair trial," and we reverse a conviction on the basis of prosecutorial misconduct only if "the conduct was so egregious as to deprive [the] defendant of a fair trial."
>
> [McNeil-Thomas, 238 N.J. at 275 (quoting State v. Wakefield, 190 N.J. 397, 437 (2007)).]

49

Stated differently, we will not reverse a conviction based on prosecutorial misconduct during the State's summation unless it "substantially prejudice[d] the defendant's fundamental right to have the jury fairly evaluate the merits of his[ or her] defense." Garcia, 245 N.J. at 436 (quoting State v. Bucanis, 26 N.J. 45, 56 (1958)).

In reviewing a claim of prosecutorial misconduct, "an appellate court must take into account the tenor of the trial and the degree of responsiveness of both counsel and the court to improprieties when they occurred." State v. Williams, 244 N.J. 592, 608 (2021) (quoting Frost, 158 N.J. at 83). "Factors to be considered in making that decision include, '(1) whether defense counsel made timely and proper objections to the improper remarks; (2) whether the remarks were withdrawn promptly; and (3) whether the court ordered the remarks stricken from the record and instructed the jury to disregard them.'" Ibid. (quoting Frost, 158 N.J. at 83). Additionally, "[i]n reviewing closing arguments, we look, not to isolated remarks, but to the summation as a whole," State v. Atwater, 400 N.J. Super. 319, 335 (App. Div. 2008), mindful that "[a] prosecutor may respond to an issue or argument raised by defense counsel" and such a response "cannot be considered a foray beyond the evidence adduced at trial." State v. Johnson, 287 N.J. Super. 247, 266 (App. Div. 1996).

Here, the State's DNA expert testified that defendant was the major contributor to a bloodstain on defendant's shoelace. She also testified that "there [was] no way to tell when DNA was placed on an item," so she would not be able to say whether DNA "was left yesterday or a year ago." During summations, defense counsel seized on the presence of defendant's blood on his shoelace to support his self-defense claim. In turn, the prosecutor responded:

> Let's talk about this mystery stuff on this shoelace, . . . defendant's DNA being on his own shoelace that he's probably tied his shoes, I don't know, they look a little worn to me, at least a hundred times, if not a lot more than that.
>
> There's a million reasons why . . . defendant's DNA could be on his own shoelace, but what we do know for certain is it didn't come from that day. There's no documentation . . . of him bleeding anywhere. No documentation of him being treated by any type of medical professional whatsoever.
>
> Again, no blood on his shirt, no blood on his face, no blood on his hands. Not to beat a dead horse, but it's because there were no injuries to [defendant] that day.
>
> [(emphasis added).]

Defense counsel did not object to the prosecutor's comments. "If defense counsel fails to object contemporaneously to the prosecutor's comments, 'the reviewing court may infer that counsel did not consider the remarks to be inappropriate.'" Clark, 251 N.J. at 290 (quoting Vasquez, 265 N.J. Super. at

560). Viewed as a whole, we are satisfied that the prosecutor's statement was "proper commentary on the evidence before the jury and not 'so egregious as to [have] deprive[d] defendant of a fair trial.'" Ibid. (alterations in original) (quoting McNeil-Thomas, 238 N.J. at 275). Rather than a misrepresentation of the evidence, the prosecutor drew a permissible inference from the evidence presented at trial.

## VII.

In Point VI, defendant asserts that even if an individual error does not require reversal, the cumulative effect of the errors deprived him of a fair trial. However, in light of our disposition of defendant's first five points, his cumulative error argument fails. See R. 2:11-3(e)(2).

## VIII.

Lastly, in Point VII, defendant argues his sentence is excessive because the judge "improperly analyzed and weighed the aggravating factors" and made "contradictory findings" without reconciling the "discrepancy between the aggravating and mitigating factors."

Our sentencing standard of review is well established. We review sentences "in accordance with a deferential standard," State v. Fuentes, 217 N.J. 57, 70 (2014), and are mindful that we "should not 'substitute [our] judgment

for those of our sentencing courts,'" State v. Cuff, 239 N.J. 321, 347 (2019) (quoting State v. Case, 220 N.J. 49, 65 (2014)). Thus, we will

> affirm the sentence unless (1) the sentencing guidelines were violated; (2) the aggravating and mitigating factors found by the sentencing court were not based upon competent and credible evidence in the record; or (3) "the application of the guidelines to the facts of [the] case makes the sentence clearly unreasonable so as to shock the judicial conscience."
>
> [Fuentes, 217 N.J. at 70 (alteration in original) (quoting State v. Roth, 95 N.J. 334, 364-65 (1984)).]

Critically, the judge denied the State's application for an extended term. Instead, based on the risk of re-offense, the extent of defendant's prior criminal record, and the need for deterrence, the judge found aggravating factors three, six, and nine. See N.J.S.A. 2C:44-1(a)(3), (6), (9). The judge also found mitigating factor eight, N.J.S.A. 2C:44-1(b)(8) ("circumstances [of offense] unlikely to recur"), and nine, N.J.S.A. 2C:44-1(b)(9) ("[defendant's] character and attitude . . . indicate [he or she] is unlikely" to reoffend). The judge placed moderate weight on both the aggravating and mitigating factors and concluded that the aggravating factors outweighed the mitigating factors "on both a qualitative and quantitative basis."

In support, the judge found defendant's criminal record consisted of eight prior arrests, two in Virginia and six in North Carolina. In North Carolina,

defendant was convicted in Superior Court of possession with intent to distribute cocaine and convicted in municipal court of resisting a public officer and injury to personal property. In Virginia, he was convicted of false statement on a consent form, a firearm violation, and assault and battery on a family member, both in Superior Court. Additionally, defendant was previously sentenced to periods of incarceration in jail as well as prison and was placed on probation. The judge explained that as "a multi-state offender," defendant's prior "contact with the criminal justice system increase[d] the risk he may commit another offense," and enhanced "the need to deter [defendant] and others from engaging in this type of conduct and violating the law."

In accepting defense counsel's arguments that mitigating factors eight and nine applied, the judge considered the presentence report, defendant's letter to the court, and defendant's sentencing allocution and found "a sufficient factual basis for both." Nevertheless, the judge stated:

> Even today [defendant] does not take full responsibility for what he's done. There's no question based on the evidence in this case that [defendant] was the individual that stabbed the victim in this case. That's not up for debate. However, [defendant] today still believes . . . or tries to lessen his culpability for what he's done. He stabbed the victim five times. And . . . I agree with [the prosecutor], but for the grace of God, but for those workers at the Petro station, but for the first responders,

54

> this could have been easily a murder case and defendant would be looking at a [thirty] do [thirty].[3]

Defendant contends the judge applied seemingly contradictory sentencing factors, placed undue weight on a stale criminal history, and failed to engage in a qualitative analysis. "Proper sentencing . . . requires an explicit and full statement of aggravating and mitigating factors and how they are weighed and balanced." State v. McFarlane, 224 N.J. 458, 466 (2016) (quoting State v. Randolph, 210 N.J. 330, 348 (2012)); see also R. 3:21-4(h). The weighing process requires the judge to do "more than quantitatively compare the number of pertinent aggravating factors with the number of applicable mitigating factors; the relevant factors are qualitatively assessed and assigned appropriate weight in a case-specific balancing process." Fuentes, 217 N.J. at 72-73. If a sentencing judge "find[s] it necessary to apply seemingly contradictory aggravating and mitigating factors," the judge should "'explain how it reconciles those two findings' by providing greater detail as to the weight assigned to each aggravating and mitigating factor and how those factors are balanced with

---

[3] See footnote 1, supra, discussing the discrepancy in the number of stab wounds in the record.

respect to the defendant." State v. Rivera, 249 N.J. 285, 300-01 (2021) (quoting Fuentes, 217 N.J. at 81).

We are satisfied the judge set forth reasons for defendant's sentence with sufficient clarity and particularity and made findings that are amply supported by competent and credible evidence in the record. Defendant's sentence was in accord with the sentencing guidelines, was based on a proper weighing of the factors, and does not shock the judicial conscience.

Affirmed.

I hereby certify that the foregoing is a true copy of the original on file in my office.

CLERK OF THE APPELLATE DIVISION

A-3806-19